COMMONWEALTH *vs.* FRED M. SMITH & others.

Essex. March 5, 1895. — April 6, 1895.

Present: FIELD, C. J., ALLEN, HOLMES, LATHROP, & BARKER, JJ.

*Conspiracy to solicit Bribes — Indictment — Evidence — Exceptions — Constitu-
tional Law — Privilege of Indicted Defendant testifying in his own Behalf.*

Certain persons were indicted for a conspiracy to solicit applicants for licenses to
    sell intoxicating liquors in a certain city to bribe such of the defendants as were
    aldermen thereof for the purpose of influencing their action on the granting of
    the licenses. *Held,* on the evidence, that they were properly convicted.

Although the St. 1893, c. 417, § 147, which requires the clerk of a city to cause
    notice of the annual election for the choice of city officers to be printed in one
    or more newspapers published in that city, and to be posted in the office of the

city clerk, does not expressly require a formal return of the publication of notice, yet if the clerk makes a return that notice of the election has been posted by him in the city clerk's office, but says nothing about publication in the newspapers, he is not precluded from afterward testifying that the notice has been published in the newspapers, nor from reading the publications therefrom.

At the trial of an indictment for a conspiracy to solicit applicants for licenses to sell intoxicating liquors in a certain city to bribe such of the defendants as were aldermen thereof, for the purpose of influencing their action on the granting of the licenses, evidence that, at a meeting of the mayor and aldermen, held after the inception of the conspiracy but before the licenses were granted, it was voted, on motion of one of the indicted aldermen, that applications for licenses should be referred to the mayor and aldermen instead of to a committee on licenses consisting of the mayor and two aldermen, as theretofore, is competent against the alderman making the motion at least, and against the other indicted aldermen if they voted for it.

At the trial of an indictment for a conspiracy to solicit applicants for licenses to sell intoxicating liquors in a certain city to bribe such of the defendants as were aldermen thereof, for the purpose of influencing their action on the granting of the licenses, it is competent for the prosecution to show the names of all the applicants for such licenses, although later in the case the names of the successful applicants appear.

At the trial of an indictment for a conspiracy to solicit applicants for licenses to sell intoxicating liquors in a certain city to bribe such of the defendants as were aldermen thereof, for the purpose of influencing their action on the granting of the licenses, the prosecution, in order to fix a date, may show the date when a licensee was permitted to transfer his license from one place to another; and, for the same purpose, that a witness, after a conversation with one of the defendants, at once telephoned to a certain person.

At a criminal trial the prosecution, having sufficiently designated the time and place, inquired of one of its witnesses touching a certain conversation in which he had previously made statements on material matters inconsistent with his testimony, and subsequently sought to contradict him by the testimony of another witness, as is allowed by Pub. Sts. c. 169, § 22. *Held,* that it was doubtful whether the objection that the witnesses testified to different conversations, not having been taken at the trial, was open at the argument in this court. *Held, also,* that, if open, the same time and place for the conversation having been fixed by both witnesses, the evidence was competent as affecting the credit of the first witness.

At the trial of an indictment for a conspiracy to solicit applicants for licenses to sell intoxicating liquors in a certain city to bribe such of the defendants as were aldermen thereof for the purpose of influencing their action on the granting of the licenses, an alderman not under indictment was properly allowed to testify that at a meeting of the mayor and aldermen, and just before acting on the licenses, the aldermen went into a committee room where they had a general conversation about the granting of the licenses; that the witness said that he wanted all the licenses to be granted, but would take no part in granting a portion of them only because that would look as if the aldermen were putting up a bid for the rest, but that the indicted aldermen wanted to grant a part of them only; and the objection that it did not appear that any one heard what such aldermen said in the committee room, not having been taken at the trial, is not open at the argument in this court.

At the trial of an indictment for conspiracy to solicit bribes, a witness for the

defence who denies his agency for one of the defendants in soliciting bribes may, such agency being material, be contradicted by the prosecution for the purpose of affecting his credit.

If, at a criminal trial, a government witness testifies to a conversation at a certain time and place between himself and the defendant, the latter cannot, after a denial of such a conversation, put in evidence another conversation between them upon the same subject at another time and place.

No exception lies to the exclusion of evidence which is not reported and shown to be material.

At the trial of an indictment for a conspiracy to solicit applicants for licenses to sell intoxicating liquors in a certain city to bribe such of the defendants as were aldermen thereof, for the purpose of influencing their action on the granting of the licenses, one of the indicted aldermen, who between the two meetings of the mayor and aldermen at which the licenses were granted and during the existence of the conspiracy is shown to have been in company with another defendant, S., a wholesale liquor dealer in Boston, with whom he had no subject of common interest except the granting of the licenses, and to have gone to Boston on the invitation of S., may be asked on cross-examination, for the purpose of affecting him only, but not S., as to his knowledge of what was publicly said after the first lot of licenses was granted as to the connection of the defendant S. with the granting of them.

A person under indictment, who at his trial testifies in his own behalf, may be asked on cross-examination, for the purpose of affecting his credit, whether, when a witness before the grand jury investigating the same matter, he did not decline to testify on the ground that he might criminate himself.

INDICTMENT, in three counts, for conspiracy. The second count, upon which the defendants were convicted was as follows:

"And the jurors aforesaid, on their oath aforesaid, do further present that Horace I. Pinkham, Charles H. Cox, Fred H. Cate, George O. Tilton, William W. Ham, Charles H. Croy, and Hadley H. Hoyt, all of Haverhill in said county of Essex, at Haverhill in said county of Essex, on the Tuesday next after the first Monday of December in the year of our Lord one thousand eight hundred and ninety-three, to wit, on the fifth day of December in the year of our Lord one thousand eight hundred and ninety-three, said fifth day of December being the day of the annual municipal election of the city of Haverhill, a municipal corporation duly established by law and located within said county of Essex, were severally duly elected by the qualified voters of the city at large, voting in their respective wards, as aldermen of said city, to severally hold their said offices as aldermen for one year from the first Monday of January next following the said fifth day of December in the year of our

Lord one thousand eight hundred and ninety-three, and until a majority of the new board should be elected and qualified in their places, said first Monday of January being the first day of January in the year of our Lord one thousand eight hundred and ninety-four, the said Horace I. Pinkham being then and there at said annual municipal election chosen from and by the qualified voters of the city at large, the said Charles H. Cox being then and there at said annual municipal election selected from the first ward of said city, the said Fred H. Cate being then and there at said annual municipal election selected from the second ward of said city, the said George O. Tilton being then and there at said annual municipal election selected from the third ward of said city, the said William W. Ham being then and there at said annual municipal election selected from the fourth ward of said city, the said Charles H. Croy being then and there at said annual municipal election selected from the fifth ward of said city, and the said Hadley H. Hoyt being then and there at said annual municipal election selected from the sixth ward of said city, and that the said Horace I. Pinkham, Charles H. Cox, Fred H. Cate, George O. Tilton, William W. Ham, Charles H. Croy, and Hadley H. Hoyt thereafter, to wit, on the said first day of January in the year last aforesaid, severally duly qualified as such aldermen, and then and there severally became and were municipal officers, to wit, aldermen of said city of Haverhill, and thenceforward severally continued to be municipal officers, to wit, aldermen of said city of Haverhill, until the day of the finding of this indictment; and that at the said annual municipal election of said city of Haverhill, holden on the said fifth day of December in the year of our Lord one thousand eight hundred and ninety-three, at said Haverhill, the legal voters of said city of Haverhill duly voted to authorize the granting of licenses for the sale of intoxicating liquors in said city of Haverhill for the year commencing on the first day of May in the year of our Lord one thousand eight hundred and ninety-four, by then and there at said annual municipal election, duly and by lawful majority vote, voting 'Yes' upon the question, 'Shall licenses be granted for the sale of intoxicating liquors in this city?' the warrant for said annual municipal election duly containing an article providing for a vote upon

said question, whereby the mayor and aldermen of said city of Haverhill, duly elected and qualified, and holding their offices for one year from the first Monday of January in the year of our Lord one thousand eight hundred and ninety-four, and until a majority of the new board should be elected and qualified in their places, might lawfully grant licenses of the first five classes for the sale of intoxicating liquors for the year commencing on the first day of May in the year of our Lord one thousand eight hundred and ninety-four.

"And the jurors aforesaid, on their oath aforesaid, do further present that Fred M. Smith, of Boston in the county of Suffolk and said Commonwealth, Charles A. Kimball, Fred H. Cate, George O. Tilton, William W. Ham, and Hadley H. Hoyt, all of said Haverhill, in said county of Essex, did, at said Haverhill, on the first day of February in the year of our Lord one thousand eight hundred and ninety-four, then and there well knowing the premises, unlawfully and maliciously conspire, combine, confederate, and agree together, and with divers other persons whose names to the jurors are unknown, to unlawfully counsel, solicit, incite, and procure divers persons who should thereafter duly make applications to said mayor and aldermen of said city of Haverhill for licenses of any of the first five classes to sell intoxicating liquors in said Haverhill, for the year commencing on the first day of May in the year of our Lord one thousand eight hundred and ninety-four, and whose names and a further description of whom are to the jurors unknown, unlawfully and corruptly severally to give gifts and gratuities, to wit, certain sums of money, the amount, value, and further descriptions of which said sums of money are to the jurors unknown, to the said Fred H. Cate, George O. Tilton, William W. Ham, and Hadley H. Hoyt, they then and there being aldermen of said city of Haverhill as aforesaid, the said applications for licenses to sell intoxicating liquors being then and there matters which might by law thereafter come and be brought before them, the said Fred H. Cate, George O. Tilton, William W. Ham, and Hadley H. Hoyt, in their official capacities of aldermen as aforesaid, with intent on the part of said divers persons who should make applications for licenses as aforesaid then and there, by the gifts and gratuities aforesaid, to influence the acts,

votes, opinions, decisions, and judgments of the said Fred H. Cate, George O. Tilton, William W. Ham, and Hadley H. Hoyt, in their official capacities of aldermen as aforesaid, upon the said applications for licenses to sell intoxicating liquors in said Haverhill thereafter to be duly made as aforesaid, against the peace of said Commonwealth and contrary to the form of the statute in such case made and provided."

The first count was the same as the second, except that it averred that the gifts or bribes were to be given to Cate, Ham, and Hoyt, instead of to Cate, Ham, Hoyt, and Tilton. The third count alleged that the defendants conspired to procure licenses to be granted to such persons as should give gifts of money to certain of the aldermen, to influence their action in the matter of granting the licenses.

At the trial in the Superior Court, before *Lilley*, J., the defendants seasonably moved to quash the indictment for reasons, which, so far as applicable to the second count are as follows. 1. That the indictment contained no averment that anything was done by the defendants, or either of them, to effect the object of the alleged conspiracy. 2. That it merely alleged that the defendants conspired to solicit certain persons who might not then be in existence, if such persons should at some time thereafter make applications for licenses to sell intoxicating liquors to corruptly influence the aldermen of Haverhill in their judgment or decision by gifts or gratuities. 3. That it did not appear that any applications would be made or were intended to be made by any one for such licenses, or that the aldermen had granted or proposed to grant licenses. 4. That the acts alleged constituted no crime at common law or under the statute. 5. That it did not appear that the persons alleged in the indictment to have been elected aldermen were elected by the qualified voters of the city of Haverhill, or that they were elected aldermen thereof. 6. That it did not appear that the legal voters of the city of Haverhill lawfully voted to authorize the granting of licenses during the year 1894, nor that any article upon the question " Shall licenses be granted for the sale of intoxicating liquors ? " in Haverhill was inserted by the aldermen in the warrant for the annual municipal election held previous to the time of the offence alleged. 7. That it did not

appear that Tinkham, Cox, Cate, Ham, Croy, and Hoyt were elected as aldermen of Haverhill, or qualified or had authority to act as such.

The motion was overruled, and the case was submitted to the jury, who returned a verdict of not guilty as to the first count, and, by direction of the judge, and with the consent of the prosecution, as to the third count also; and returned a verdict of guilty on the second count. The defendants alleged exceptions.

After verdict, the defendants moved in arrest of judgment, on the ground that, as they had been acquitted on the first and third counts, they could not be convicted on the second count so far as the conspiracy to solicit persons to pay money to Cate, Ham, and Hoyt to influence their votes was concerned, and that a conspiracy to solicit applicants for a license to pay money to Tilton alone was not sufficient to constitute the offence set forth in the second count.

The motion was overruled; and the defendants alleged exceptions. The material facts appear in the opinion.

*A. Hemenway*, ( *W. E. Russell* with him,) for Smith.

*G. C. Dickson & C. S. Knowles*, ( *E. B. Fuller* with them,) for Kimball.

*E. B. Fuller*, for Cate and Ham.

*H. P. Moulton*, for Tilton.

*W. H. Moody*, District Attorney, for the Commonwealth.

ALLEN, J. The conviction was only upon the second count of the indictment. The motion to quash and the motion in arrest of judgment were not argued in behalf of any of the defendants, though they were not expressly waived. No objections to the count have been pointed out. We see no ground for quashing it, or for arresting the judgment.

The defendants object that the evidence was not sufficient to warrant a conviction. The grounds of objection relied on are, (*a*) that no conspiracy between the defendants was proved; (*b*) that certain of the defendants took no part in any conspiracy; (*c*) that if there was a conspiracy, it was not with reference to all four of the aldermen named; and especially that there was no conspiracy to solicit bribes for Tilton.

A conspiracy may be proved by circumstantial evidence, and

this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy. Carson's Am. Cas. on Conspiracy, c. 5. 3 Greenl. Ev. § 93. 2 Bish. Crim. Proc. § 227. *United States* v. *Cole*, 5 McLean, 513. *State* v. *Sterling*, 34 Iowa, 443. *Archer* v. *State*, 106 Ind. 426.

The order of introducing the evidence is within the discretion of the presiding judge. 3 Greenl. Ev. § 92. *State* v. *Winner*, 17 Kans. 298. *Bloomer* v. *State*, 48 Md. 521. *State* v. *Jackson*, 82 N. C. 565. Carson's Cases, *ubi supra.*

An examination of the testimony, which is reported to us in full, satisfies us that the jury were warranted in finding that there was a conspiracy to solicit bribes for aldermen; that all the defendants took part therein; and that the purpose was to solicit bribes for the four aldermen named in the indictment. There being *prima facie* evidence of a conspiracy, the participation of each defendant therein may be shown by his own acts and declarations during the existence of the conspiracy; and these same acts and declarations may also tend to establish the conspiracy itself. The testimony which was relied on by the prosecuting officer tended to show the following state of things.

The defendant Smith was a wholesale dealer in liquors in Boston, with customers in Haverhill, at which place the defendant Kimball was his agent. The other four defendants, Tilton, Cate, Ham, and Hoyt, were aldermen of Haverhill. There were in all seven aldermen, but there was no charge or evidence against the other three. The whole number of licenses to sell liquors which could be granted in Haverhill was twenty-seven. The licenses would date from May 1. On April 16, 1894, fifteen licenses were granted, and on April 27 twelve more. The whole number of applications for licenses was forty-one. Prior to March 6, 1894, when it is contended that the conspiracy was first entered into, the defendant Kimball knew all of the four indicted aldermen; Smith was well acquainted with Tilton, had perhaps met Cate once or twice, though he

did not remember having done so, and did not know Ham or Hoyt. One evening Tilton mentioned to Kimball that he was going to Boston the next day, and Kimball said he would go down with him and take him out to dinner. They accordingly went, the date being March 6; Tilton, seeing Cate and Ham in Boston, invited them to the dinner, and they were to come for him to the store of the defendant Smith. Tilton also met McDonald, a licensed liquor dealer of Haverhill, and a customer of Smith, on the street, and they went together to Smith's, and after a while Cate and Ham went there also. Kimball was already there; and the six went to a hotel in which Smith was interested, remained for over three hours, dined there, and took a carriage for a drive. McDonald left them for a time at 6.30 P. M., and afterwards met them at another hotel at 10 P. M., where all had a lunch (as it was called) at Tilton's expense, and all but Smith went home together in a late train. Cate testified that the subject of licenses was mentioned, and that Smith tried to pump him. It did not appear that they had any other subject of common interest. On April 13, Smith sent some liquors to Tilton, to Cate, to Ham, and to Hoyt; his purpose and object, as he testified, being that of good fellowship and to get their good will. Kimball knew that the liquors were sent, and the four aldermen all accepted them. On April 14, the four aldermen, without having been sent for, went to visit the mayor at a place four or five miles from Haverhill, and they all met there. A meeting of the aldermen was called for April 16. Six aldermen were present, and on motion of Tilton it was voted by the four indicted aldermen to grant licenses, the mayor and two aldermen opposing. A question arose as to acting upon a part only of the applications for licenses. One alderman, Pinkham, objected to doing this, because it would look like putting up a bid for the rest. That course, however, was adopted, the four indicted aldermen voting for it; and it was voted on motion of Ham to grant not exceeding fifteen licenses at that meeting. Fifteen licenses were accordingly granted. The defendant Smith was in Haverhill on that day, and was in the city hall at the time of the meeting of the aldermen. Kimball was also there. Smith told Cate and Tilton who his customers were, and that, if they could do anything

for him, he should appreciate it.   He also told one Dearborn before the meeting that the aldermen would vote that night on some of the licenses.   Before that date, these four aldermen had met Kimball at a supper at a restaurant in Haverhill, and three of them had also met him on another evening at the same place.   On the evening of April 16, the six defendants were all together at another restaurant, the proprietor of which had that day received a license.   The foregoing evidence had a tendency to show an intimate and suspicious companionship of the defendants, and some common purpose, before and on the day when licenses were first granted.

Cate testified that after the first lot of licenses was granted there was a good deal of public talk and excitement in Haverhill, and that he had heard Smith's name mentioned a few times in connection with the granting of licenses.   On or about April 21, the defendants Cate, Ham, and Hoyt went together to Boston by Smith's invitation, and in the evening visited the Italian quarter of the city and had a supper with Smith, who had got an officer to go with them.   This had a tendency to show that the common purpose, at least so far as those four were concerned, was still continuing.   In order to show that this common purpose was the same that was charged in the second count of the indictment, testimony of acts and declarations of the several defendants were relied on as follows.

Before April 16, Smith and Kimball both said or intimated to Leighton, who was an applicant for a license, that he would have to pay money in order to get it; that he had better see others of the aldermen besides Pinkham and Croy.   Smith told him that it would cost him $200 for his license, and told him " to get a hustle on, and go and see the aldermen "; and that the money was to be paid to Smith.   No license having been granted to Leighton on April 16, Kimball advised him the next day to go to Boston and see Smith, which he did, and Smith told him he would have to " see those aldermen and settle to get a license," and to go and see Hoyt without fail. Leighton went the next morning to see Hoyt, who intimated that he wanted money, and told him that whatever Smith said was all right.   Leighton within a day or two told this at Haverhill to Smith, who said he would go down town and see what

he could do for him, and if he could n't do anything Leighton was to have a couple of hundred dollars in money ready for him when he came back.

Porter C. Croy testified that between April 1 and April 10 Kimball told him that his brother, Alderman Croy, must be a damn fool, when he might as well get $400 or $500 out of it as nothing. The witness asked him, " Have n't you got enough votes now ? " Kimball told him (in substance) that he had, and that he had got Aldermen Cate, Ham, Tilton, and Hoyt fixed up. Being asked where he was going to get the money to pay the $400 or $500 to witness's brother, Kimball replied, " I will take care of that."

Connolly testified that, between the granting of the first and the second lots of licenses, he told Smith that he would like to have a license; that Smith told him the boys were getting up a pool to carry on the campaign next fall to have the city vote in favor of license; and that $500 should be paid by Connolly, and afterwards told him that he would let him down for $200; and that if he paid $200 he should have a license.

Bourque testified to a conversation with Tilton between the granting of the first lot of licenses and the second. Bourque was interested to get a license for one Roque and told Tilton there was a rumor that money was needed to get the licenses. Tilton said he did n't know, and at any rate he would n't take any money from anybody for his vote; he would find out, and if there was anything new he would let Bourque know. Afterwards, before April 27, Tilton told him they were all bidding to get their licenses, and he told Bourque to see Roque and tell him it would require $200 for his license; " if he gives you the money, you come to me, and I will tell you who to give it to." Tilton had a slip of paper with names upon it, and sums marked against each; $200 against Roque's.

Merriam also interceded for Roque with Tilton, who said to him, " I would not take a dollar from any man; but if you fellows want Roque to have a license, you will have to settle with Cate and Ham." Ham came in; witness asked him if he would vote for Roque's license. He said he thought he would; he supposed there was a way to get at it. Cate came in. Merriam asked Cate if he would vote for Roque; he said he thought he would.

Donahue was an applicant who failed to get a license on April 16. Kimball went to his store and told him he.would like to have Francis (Donahue's brother) see Fred (the defendant Smith); that Fred could help him. Donahue went to see Smith, who said it would be necessary to have a fund to protect themselves, and get the city into the "Yes" column, for license. Donahue asked what his contribution would be, and was told about $300, and Smith said he would be in Haverhill on Monday.

To Dearborn, an applicant, Smith said, on April 16, there was great need of doing something to keep the city in the "Yes" line; that in order to do it, it took money. Dearborn said he was always willing to take hold and help, and asked how much it would be, and what they were going to pay. Smith said about $300, he thought. He said he was forming a club.

Cate sent Smith to Dr. Clement, who had asked Cate as to the way of getting a license and whom to see.

Carroll was an applicant for a license. He got none on April 16, but obtained it on April 27. He talked with Cate, who asked or ordered him to send some liquor to Ham, which was done. He talked with Hoyt, who said he would not advocate Carroll's license with the other aldermen unless he had some money to do it with; and that it was the understanding that men who got licenses should pay for them, and referred Carroll to the other aldermen. Before April 16, Carroll talked with Tilton, who told him he could do business with Hoyt and Cate, and could buy them, and assured Carroll of his own support. Afterwards, April 11, Tilton called on Carroll and said, "I came to talk with you about your license. What I say to you is never to go any further. I give you this as strictly Masonic. You can have a license, but three of the aldermen must be paid $150 apiece. I don't want a cent. You shall have my vote." Carroll said he should not pay money to continue his business, but "any one who would interest themselves to assist me to procure a license, or would devote any of their time in my behalf to procure the same, I should of course expect to pay them for their time," and asked what day they would want the money. Tilton said, "Any time."

As bearing upon Tilton alone, there was evidence that he

afterwards tried to persuade Carroll not to say anything before the grand jury about the conversation.

Taking all the evidence together, of which the foregoing is an abstract of only the most significant portions, it was sufficient to warrant a finding by the jury that all of the defendants took part in a conspiracy to solicit applicants for licenses to give money to all four of the aldermen named. The evidence tended to show that Smith and Kimball were the chief agents to communicate with the applicants for licenses. It is true, that it was sometimes represented that the money was wanted to be used in the city election, which was to take place in the following December. But the jury might well infer that, if money was wanted from applicants for licenses just before the time for granting licenses, it was to be used in aid of their obtaining licenses. It was specially urged that the evidence did not warrant a finding that Tilton was to be paid anything. It is true that Tilton said to Bourque, Merriam, and Carroll that he would not take any money himself. But from his relations and communications with Smith and Kimball and with his three associates, and from his interest in the general scheme of inducing payments of money, it might be inferred that the four aldermen were acting together, and that he was to be included in the distribution of the money when obtained, notwithstanding his verbal disclaimer to Bourque, Merriam, and Carroll.

The other objections relied on in argument relate to the admission or exclusion of evidence, and to the instructions of the court in relation thereto, and are as follows.

1. The city election for the choice of aldermen was held on December 5, 1893. By St. 1893, c. 417, § 147, the city clerk, under the direction of the board of aldermen, was required to cause notice of the meeting to be printed in one or more newspapers published in the city, and also to be conspicuously posted in the office of the city clerk; but there is no express requirement that he should make a formal return. In the warrant, as it was called, or notice for the election issued by the city clerk, an order was recited that notice of the above meetings shall be given by publishing a copy twice in two specified newspapers, and by posting a copy of the same in the city clerk's office. The city clerk made a return thereon, that a certified copy of

the notice had been posted by him in the city clerk's office, but said nothing about the publications in the newspapers, and at the trial he was allowed to testify that the copies had also been published in the newspapers, and to read the said publications from the newspapers; but the defendants objected that the omission in the return as to publication in the newspapers could not be thus supplied, and that it did not appear that the aldermen were duly elected.

We do not wish to affirm that the return of the city clerk was, of itself, evidence of as high a character as his sworn testimony; but, assuming this in favor of the defendants, yet an election is not to be set aside for a mere informality or irregularity which cannot be said in any manner to have affected the result of the election. Dillon, Mun. Corp. § 197, note. *Commonwealth* v. *Smith*, 132 Mass. 289. The aldermen were elected and acted as such without objection, and no question as to the validity of their election was raised, so far as appears, until the trial of this case.

2. There was evidence to show that at the outset the mayor and Aldermen Pinkham and Croy were appointed a committee on licenses, under an old rule formerly adopted, but not specially re-enacted during the current year; and that on March 19, 1894, on motion of the defendant Tilton, a vote was passed that the mayor and aldermen should be a committee to whom all applications for the sale of liquors should be referred; and that thereafter only applications for druggists' licenses were referred to the committee composed of the mayor and Aldermen Pinkham and Croy. The effect of the vote was to change the course of proceedings on applications for all other licenses, so that the four aldermen now under indictment should join in passing upon them in the first instance. This evidence was competent as against Tilton, at least, and would be competent against the other indicted aldermen, if they voted for it.

3. Evidence was admitted of the applications of forty-one applicants for licenses. The objection suggested, but not much pressed, to this evidence is that, since the names of the successful applicants appeared later in the case, the jury might thus learn who failed to procure licenses, and might be led erroneously to infer partiality on the part of the aldermen. We see no force in this objection.

4. Evidence was admitted, under objection, of the date when the witness McDonald was allowed to transfer his license from one place to another. This evidence was offered merely to fix a date; and the date had some significance in the subsequent testimony of McDonald and of Arnold. This objection is not dwelt on, and is without force.

5. The witness McDonald, having testified that he paid nothing to any one in respect to granting his license, and that he knew of nobody who did so, was asked if he had a conversation with one Arnold in the latter's sales-room within one or two days before the transfer of his license, (which transfer was applied for on March 12,) in which he said to Arnold in substance that "different ones to his knowledge had put in from $100 to $200 apiece around to get the licenses; . . . it cost me $100; . . . I ain't saying anything about who I paid it to, but Hoyt got it." The witness answered that he had no recollection of saying anything to him of the kind, and nothing in substance of the kind. These latter questions were asked with a view to contradicting him, as allowed by Pub. Sts. c. 169, § 22, under which it is necessary to mention to the witness " the circumstances of the supposed statement, sufficient to designate the particular occasion." It is now objected that the particular occasion was not mentioned to McDonald; but we think the time and place were sufficiently fixed.

It is also objected that the questions to McDonald were on immaterial matters, and that the government was bound by his answers. But it would be plainly material to show that at this time, which was after the date when the alleged conspiracy began, he and others were paying money in order to get licenses, and that Alderman Hoyt had got the money paid by him. Arnold was subsequently called as a witness, and it was sought to contradict McDonald by him. The objection to Arnold's testimony, which is now relied on, is that he was permitted to testify to an entirely different conversation with McDonald.

It is doubtful if this ground of objection is open to the defendants, as it was not taken at the trial. If open, the time and place fixed by Arnold for his conversation were the same, namely, just prior to the transfer of McDonald's license, and at Arnold's sales-room. Although his testimony did not contradict

McDonald so fully as the government appeared to expect, yet to some extent it contradicted him, and it tended to show that McDonald then said that it had cost him about $100, (meaning, in order to get his license,) and that Hoyt might have got it, or some of the others. Merely as affecting the credit to be given to McDonald as a witness, this evidence was competent; and to this it was carefully limited in the instructions to the jury.

6. Alderman Pinkham was allowed to testify that at the meeting of April 16,* just before acting on the applications for license, the aldermen took a recess and went into the committee room; that they all talked about granting the licenses; that they took a recess to go in and talk the matter over; that he said he wanted to go in and grant all the licenses, but would n't go in and take any part in granting part of them, because it would look as if they were putting up a bid for the rest of them; that it was a general conversation, and each of the four aldermen wanted to grant the licenses (i. e. a part of them). It is now urged that it does not appear that any one heard what Pinkham said. This ground of objection was not stated at the trial, and it is not now open. It seems probable that the defendants heard it, and if they did not of course the jury would have been instructed to disregard it, if a request to that effect had been made. The evidence was competent, as showing the course pursued by the four indicted aldermen, in view of the objections of the mayor and of the witness.

7. Dr. Clement, after testifying to a conversation with the defendant Smith, was allowed to say that he at once telephoned to Arnold. This was admitted merely as fixing a time, and nothing was admitted of what was said through the telephone. It was competent for this purpose.

8. Laubham, who was Tilton's clerk, being a witness for the defendants, testified on cross-examination that he did not on a certain occasion say to Carroll, in substance, "George [Tilton] wants to get that money"; that Tilton did not ask him to get any money from Carroll; and that he did not tell Carroll that

---

* It appeared that one of the aldermen was absent from this meeting, and that the mayor opposed the granting of licenses, saying that it was his wish that no licenses should be granted until the full board was present.

he, witness, was the middleman, and that it would be safe to give the money to him. The government was allowed to call Carroll in contradiction. The defendants now contend that, as Laubham denied his agency for Tilton, his declarations were immaterial, and could not be contradicted. But it was material whether he was or was not Tilton's agent, and his denial of agency might therefore be contradicted merely for the purpose of affecting Laubham's credit as a witness, to which it was limited. *Hathaway* v. *Crocker*, 7 Met. 262.

9. The witness Croy, brother of Alderman Croy, testified to a conversation with the defendant Kimball, while driving with him to Boxford at some time between the 1st and 10th of April. The most significant things testified to were, that Kimball said Croy's " brother must be a damn fool, when he might as well get $400 or $500 out of it as nothing "; to which Croy said, " Kimball, the first thing you know, you will get yourself into trouble if you do anything like that." Kimball said, " Yes, you always was a damned fool and scared to death, or you might have sold more rum, and got more money." Croy said, " Have n't you got votes enough now? Have n't you got Alderman Cate, and Alderman Cox, and Alderman Ham, and Alderman Tilton fixed up? " Kimball replied, " Yes." And then in answer to the question, " Alderman Cox? " Croy answered, " No, the four aldermen." In answer to the question, " What four? " Croy said, " Alderman Cate, Alderman Ham, Alderman Tilton, and Alderman Hoyt." When Kimball spoke of the $400 or $500, Croy asked where he was going to get the money to pay the $400 or $500 to Croy's brother, and Kimball replied, " I will take care of that." Croy testified positively that he was not mistaken as to the place of this conversation, and that it was not in his drug store, and was not about Thomas McDonald, or relating to the transfer of McDonald's license. Kimball was called in defence to contradict Croy, and fixed the time of the drive to Boxford as April 8, but denied in detail that he then said any one of the things above mentioned which were attributed to him, or that the conversation related at all to licenses. He then testified that he had another conversation with Croy in Croy's store about the 1st of March, and was asked what it was. Objection being made, Mr. Hurlburt, for the defence,

said, " We claim there was not any talk on the road to Boxford about licenses, but that previous to that time Croy and Kimball did have a conversation with reference to a license or transfer of a license, and that the interview that Croy is trying to detail upon the stand was not the interview in Boxford, but was the interview that took place in the store between Kimball and Croy." The court asked, " How is it competent to show that on another occasion they did have a conversation somewhat similar to that, but it was not on that occasion ? " Mr. Moulton, also for the defence, said, " Because time is not the most essential thing. The most essential thing is what occurred between those two men. I suppose any witness may be mistaken as to the time. We propose to show that there was a conversation between these parties in which there was something said from which we shall ask the jury to find that that was the conversation that this witness has given an incorrect account of." The court : " If the point is that Croy was mistaken as to the time, but not as to the conversation, the substance of it, of course you may show it was another time when that happened, but I don't think you are entitled to show that there was another conversation between him and Croy with reference to the same matter, because the Commonwealth has asked about one conversation alone. In other words, I think you have a right to examine this witness with reference to that conversation, whether it took place on one day or another day, if it is a mere question as to time." Mr. Hurlburt : " Well, we do not limit ourselves to that. We say the conversation testified to by Croy never took place ; but we say that there was a conversation between Kimball and Croy at a time other than what Croy states, and from that conversation that Croy has distorted the conversation, and has testified and has given a distorted version of that conversation upon the stand."

The court excluded the testimony. Mr. Hurlburt said, " I suppose we have stated it fully enough ? " Mr. Moulton added, " We claim that we have a right to have the jury listen to this conversation, and say whether that is the one that Croy has incorrectly detailed."

It thus appears that the offer was to show a conversation between Kimball and Croy at another place, several weeks earlier, and at a time before the alleged conspiracy was entered

into. If a new trial were to be granted on account of the exclusion of this testimony, it would be in order to allow the defendants to introduce testimony which, for all that we know, might prove to be entirely immaterial and unimportant. No statement was made at the trial which enables us to see that the offered testimony would have any significance. The counsel, being well aware of the rule, (see *Crowley* v. *Appleton,* 148 Mass. 98, 100,) obviously had a misgiving as to this, and no doubt made their statement as strongly as the facts would warrant. The object of allowing a bill of exceptions is to enable us to see if any legal error producing harm to a party was committed at the trial. It has accordingly often been said that exceptions to the exclusion of testimony will not be sustained, unless enough appears to show to this court what the testimony was expected to be, and that it was material. We are reluctant to apply this rule in cases where we have no real doubt what the party offering the testimony expected to prove, even although it is not distinctly stated. In the present case, we are wholly in the dark as to what the counsel for the defence expected Kimball to testify to. We are unable to see that the excluded testimony would probably have been favorable to him. Not enough was stated to enable us to infer that the testimony of Croy was a distorted version of another conversation upon the same subject; and the distance of time makes this theory improbable. The exclusion of the evidence, therefore, furnishes no ground for a new trial. *Crowley* v. *Appleton,* 148 Mass. 98. *Smethurst* v. *Barton Square Church,* 148 Mass. 261. *Farnum* v. *Pitcher,* 151 Mass. 470.

10. The questions put in cross-examination to the defendant Cate as to the public talk about the defendant Smith's connection with the granting of the licenses were properly allowed.*

---

* Upon the cross-examination of Cate the district attorney asked him the following questions:

" *Q.* Rightly or wrongly, there was a good deal of public talk and excitement in Haverhill after the first lot of licenses was granted? *A.* Yes.

" *Q.* Whether it was right or wrong ? *A.* Yes, sir.

" *Q.* Mr. Pinkham leaving the board and saying what he did made a good deal of excitement ? *A.* Yes, sir.

" *Q.* And Smith's name in connection with these licenses was the matter of common public talk, wasn't it, if you heard it? *A.* I heard it mentioned a few times."

The time referred to was after April 16, and apparently before April 21, while the alleged conspiracy was in full force. Cate's knowledge of what was publicly said of Smith bore directly upon Cate's own conduct in being with him, and going to Boston on April 21, on Smith's invitation, to visit the Italian quarter, and this was the aspect directly presented by the cross-examination. · The evidence was not admissible to affect Smith, but was admissible to affect Cate. ·

11. The objection most relied on by the defendants is as to the ruling of the court requiring the several defendants, while testifying in their own behalf, to answer the questions whether they did not refuse to testify before the grand jury on the ground that they might thereby criminate themselves. But this objection also is unavailing.

It was within the constitutional right of the several defendants, when testifying before the grand jury, to refuse to answer questions on that ground. Declaration of Rights, art. 12. By Pub. Sts. c. 169, § 18, cl. 3, it is provided: " In the trial of all indictments, complaints, and other proceedings against persons charged with the commission of crimes or offences, a person so charged shall, at his own request, but not otherwise, be deemed a competent witness; and his neglect or refusal to testify shall not create any presumption against him." This provision of statute does not in terms include an investigation before the grand jury, which cannot be considered as a trial. But it may be assumed that the provision of the Constitution needs no statute to reinforce it in this particular, and that the refusal to testify before the grand jury could create no presumption against the defendants, whether the above statute applies or not. This means, no presumption upon which a legal judgment or consequence could rest. Magistrates and courts in their official action must give no weight to it. One who avails himself of his constitutional privilege, and refuses to accuse or furnish evidence against himself, shall be subject to no injurious consequence under the law by reason of his having done so. The Constitution and laws do not and could not assume to say that no unfavorable private opinion should be formed. The protection afforded by the Constitution is that the individual shall not be prejudiced at law by his silence, if he keeps silent.

This protection, like other constitutional rights and privileges, (e. g. the right of trial by jury, *Parker* v. *Nickerson*, 137 Mass. 487, 492, and *Dole* v. *Wooldredge*, 142 Mass. 161, 179,) may be waived. If an ordinary witness, who is not a party to a cause, knowing that he is not bound to testify concerning a fact which may tend to criminate himself, voluntarily answers in part, he waives his privilege, and may be fully cross-examined. *Foster* v. *Pierce*, 11 Cush. 437. *Commonwealth* v. *Price*, 10 Gray, 472, 476. *Commonwealth* v. *Pratt*, 126 Mass. 462. And by universal consent, if one under indictment avails himself of a statute allowing him to testify, and voluntarily becomes a witness in his own behalf, he waives his constitutional protection, to a certain extent at least. He is not bound to testify. He may remain silent relying on the statutory provision that his neglect or refusal to testify shall not create a presumption against him. But if at his own request he becomes a witness in his own behalf, he takes an oath to tell the whole truth. In this Commonwealth, the cross-examination is not restricted to matters inquired of in chief. He may be cross-examined like other witnesses. He may be questioned as to all incriminating circumstances, and he must answer all such questions as are relevant to the subject of the charge against him. Whatever he has said or done, or omitted to say or do, which is relevant, may be inquired into. By taking the stand as a witness, he has consented and offered to submit to such inquiry; and he must testify to whatsoever has a legitimate bearing upon the question of his guilt. This has often been held in this State, as well as elsewhere. *Commonwealth* v. *Lannan*, 13 Allen, 563. *Commonwealth* v. *Mullen*, 97 Mass. 545. *Commonwealth* v. *Bonner*, 97 Mass. 587. *Commonwealth* v. *Gorham*, 99 Mass. 420. *Commonwealth* v. *Morgan*, 107 Mass. 199. *Commonwealth* v. *Nichols*, 114 Mass. 285. *Commonwealth* v. *Tolliver*, 119 Mass. 312. *Commonwealth* v. *Sullivan*, 150 Mass. 315. *Commonwealth* v. *Moore*, 162 Mass. 441. See also *State* v. *Witham*, 72 Maine, 531; *State* v. *Ober*, 52 N. H. 459; *People* v. *Tice*, 131 N. Y. 651; *S. C.* 15 Lawyer's Ann. Rep. 669, and note by Greene; *Disque* v. *State*, 20 Vroom, 249; *Spies* v. *People*, 122 Ill. 1,235. He can be attacked, impeached, discredited, like other witnesses, by being confronted with evidence of former convictions of crimes, of previous incon-

sistent statements or acts, or of bad reputation for truthfulness. Pub. Sts. c. 169, §§ 18, 19. *Commonwealth* v. *Bonner, Commonwealth* v. *Gorham,* and *Commonwealth* v. *Sullivan, ubi supra.*

The defendants, however, contend that this rule, although it may be true as a general proposition, is not applicable to the facts of this case. The particular question now presented is, whether one under indictment, and voluntarily testifying in his own behalf on his trial, must disclose the fact that, when an involuntary witness before the grand jury which was investigating the same matter, he refused to answer on the ground that he might criminate himself. It is contended that this is a fact of no probative force against him, being merely an assertion of his constitutional right; and that by testifying afterwards he did not waive the protection of the Constitution as to this fact, which stands on special grounds, peculiar to itself.

We are unable to assent to either of these views. We have no occasion at this time to enter upon the consideration of the question whether such refusal to answer could have any legitimate bearing upon the general question of the guilt or innocence of the accused ; that is, whether it could be regarded as in the nature of an implied admission of guilt. The presiding judge in his instructions to the jury expressly excluded this view, and limited the effect of the refusal to its bearing upon the credit to be given to the witness. He ruled in effect that, where a defendant now testifies that he is innocent of a criminal charge, the fact that he has heretofore refused to answer in relation to the subject on the ground that his answers might tend to criminate him may be considered as bearing upon the credibility of his present testimony. The defendant in such case now says that he is innocent. He formerly did not say that he was innocent, but that he would not answer lest he might criminate himself. This fact, though open to explanation, has some tendency to throw a doubt upon the truth of his present testimony, and thus has some bearing upon one material question, namely, the truthfulness of the witness.

Nor can we assent to the doctrine that the waiver by the defendant of his constitutional protection is only partial. By becoming a witness, he throws away his shield. He voluntarily accepts the position, and requests the privilege of testifying in

his own behalf.  If he remains silent, the law jealously guards and preserves his rights, cuts off all injurious comments, and as far as possible protects him from unfavorable inferences.  *Commonwealth* v. *Harlow*, 110 Mass. 411.  *Commonwealth* v. *Maloney*, 113 Mass. 211.  *Commonwealth* v. *Nichols*, 114 Mass. 285, 287. *Emery's case*, 107 Mass. 172.  *Commonwealth* v. *Scott*, 123 Mass. 239.  *Commonwealth* v. *Hanley*, 140 Mass. 457.  If, however, he seeks the benefit of testifying, he cannot stop short with matters which are favorable to himself, but must submit to be questioned also as to relevant matters which are adverse.

We cannot adopt the view taken in Cooley, Const. Lim. 317, and apparently in *State* v. *Bailey*, 54 Iowa, 414, that a defendant in an indictment who is testifying in his own behalf may stop at any point he chooses.  An ordinary witness, who is not a party, has a right to stop when he is first questioned in respect to facts which may tend to criminate him; Taylor, Ev. § 1465; but a party under indictment who on his trial offers himself as a witness knows in advance that such questions are to be put, and that he is to testify as to his guilt or innocence, and he waives his constitutional protection in advance.  *Commonwealth* v. *Nichols*, 114 Mass. 285.  *Andrews* v. *Frye*, 104 Mass. 234.  *Commonwealth* v. *Tolliver*, 119 Mass. 312.

On a review of the whole case, we find no error injurious to the defendants in the trial.     *Exceptions overruled.*