## STATE v. BEN YOUNGQUIST.[1]

March 8, 1929.

No. 27,202.

[1]Reported in 223 N. W. 917.

*Albert Johnson* and *Jenswold, Jenswold & Dahle,* for appellant.

*G. A. Youngquist,* Attorney General, *James E. Markham,* Deputy Attorney General, and *Michael B. Hurley,* County Attorney, for the state.

HOLT, J.

Defendant, convicted of murder in the first degree, appeals. About seven o'clock in the evening of January 20, 1928, Milo Smith, who lived on a farm in Pine county, about two miles west of Rutledge, was shot down in his home. Budd Snoek and defendant were jointly indicted charged with the crime. They were tried separately, Snoek being tried first and convicted.

Defendant lived about two and one-half miles west of Smith on the same highway, called the Rutledge road. Early in the morning on the day of the crime defendant's dwelling burned down. He and his two boys, eight and ten years old, found temporary shelter with a near neighbor, Gardner. In the forenoon Mr. Gardner drove defendant to Finlayson, where some clothes for the boys and provisions were bought. Gardner returned with these to his home, while defendant walked to Rutledge, took a bus to Willow River, and then walked a mile and a half out in the country to notify the agent who had insured his house of the fire. Snoek lived at Rutledge. He and defendant were friends, having worked together and both having seen service overseas in the World War. On the way to Willow River, Snoek saw defendant as he passed Rutledge and requested him to call on his return. Defendant, returning shortly after six o'clock, called at Snoek's home and was invited to supper. While there Snoek stated he believed Smith set fire to defendant's house,

and he proposed that they go out and kill him. He also used the expression "get him." Defendant responded that that would be an awful thing to do, that he accused no one of setting the fire. When defendant started to leave, Snoek got his coat to go also. His wife, who had heard part of the conversation and had joined defendant in saying that it would be an awful thing to kill Smith, tried to persuade Snoek to stay at home. He said he had a right to go out and look for chickens. Snoek kept chickens and defendant had over 200, but there was no talk that Snoek should go out and see defendant's chickens for any purpose. It was a cold night, estimated to be about 20° below zero. Snoek was sensitive to cold. He had been injured in the war and had received three years' vocational training.

Smith's home was about two rods south of the Rutledge road and about the same distance west of the Finlayson road. Between the house and roads was a dilapidated wire fence. A few feet west of the house a gate led to the home from the Rutledge road. There is a mail box on the south side of the Rutledge road about a rod west of the west side of the Finlayson road. When Snoek got to the mail box, he started southerly, stepped over the fence, and walked toward the easterly side of the house. Defendant, walking toward the gate, called to Snoek to come back as there would be trouble if he went in. Snoek told him to come on. Defendant went in at the gate. The door was on the south side of the house near the southwest corner. When they met at the door, defendant again requested Snoek not to go in. Snoek knocked. Smith called, "come in." But they waited until Smith opened the door and called out, "come in, boys." Snoek stepped in ahead. As defendant followed he noticed the pistol in Snoek's right hand.

Inside the door Snoek stood facing Smith and defendant slightly in front and to the left of Snoek. Snoek asked Smith for "booze," and Snoek and Smith whispered or talked low a few words and stood smiling or "grinning" at each other. Then Smith turned his head and body toward defendant and said, "Ben, you are not wanted here, and you know it." At that Snoek raised his arm with the gun, saying, "You s— of a b—" and fired, the bullet entering

Smith's left ear. Smith stiffened up and fell face forward to the floor. Snoek stepped over the body and emptied the pistol into his back. Every bullet of the nine fired, save one, inflicted a fatal wound.

Snoek grabbed defendant and started out, going southeast to the Finlayson road, and the two walked south thereon away from their respective homes until they came to the railroad track. At one time Snoek told defendant to keep his "trap" shut or he would get the same dose that Smith got. Defendant answered that if officers inquired about it he would tell the truth. At that they parted, Snoek walking to the north on the railroad track, and defendant south and then westerly toward a winter road connecting with the Rutledge road. The course defendant took from Smith's house increased the distance to Gardner's some six miles over what he would have traveled had he continued on the Rutledge road from Smith's. He arrived at Gardner's a little after ten o'clock. He said nothing of what he had witnessed.

Snoek and defendant both disliked Smith and were unfriendly towards him. When they spoke of Smith they referred to him as "the dog" and the like. Snoek on leaving the scene of the murder said to defendant, "there is one dog gone."

The foregoing is substantially defendant's story of the occurrence as told on the witness stand.

On Sunday, the 22nd, the county attorney, sheriff and coroner had ascertained enough facts to make inquiries of defendant and the Snoeks. Defendant had served as a constable several years. He had also been employed by a former sheriff upon liquor raids and had then worked with deputy sheriff Danelski, with whom he was on friendly terms. Danelski went to defendant's farm, saw him there, and requested him to go to Finlayson, where the county officers desired to talk to him. Before he went he asked the deputy whether he should take his gun along. He was told to do so. He owned a Luger automatic pistol of a different caliber than the one Snoek used. Defendant had his Luger with him when Smith was killed. It had seven loads in it, two shots having been fired at the

time he discovered his house on fire in the attempt to summon help. The above facts and some additional details defendant told the county officials at Finlayson, and also in the presence of the Snoeks at Rutledge later in the evening before Snoek and he were put under arrest.

The crime came to the knowledge of the county officials named in this wise: Smith was single and lived alone until the early part of January, when Arthur Moilenan came to live with him. Each owned one horse and proposed to do some work together. A few minutes before Snoek and defendant arrived at the house, Moilenan had gone to the barn, a few rods west of the house, to feed the horses and was in the act of throwing some hay down when he heard Smith call out, "come in, boys." They expected neighbors to come on a visit, and Moilenan concluded they had come. A few moments later he heard what he deemed repeated knockings at the door and thought others than the expected neighbors had come. What he took for knocking at the door was the discharge of Snoek's gun. Moilenan, returning from the barn, discovering what had occurred, at once gave the alarm, and the sheriff and coroner were notified.

The main contention on this appeal is that the evidence did not justify the jury in finding the defendant guilty beyond a reasonable doubt. It must be conceded that the act of Snoek that evening, shooting down a defenseless man without any immediate provocation, indicates an abnormal mind. And it may well be that a normal person unexpectedly witnessing such cold-blooded murder would be so shocked that for the time being his faculties would cease to function. The theory of the defense was that defendant was overcome by the unexpected tragedy, and that afterwards fear of Snoek's threat continued to possess him. The theory of the state was that defendant knew Snoek's purpose was to kill Smith and with that knowledge aided and encouraged its accomplishment. The issue thus raised was submitted to the jury in language which defendant's counsel concedes correctly states the law from the viewpoint of the defense, as these excerpts from the charge will show:

"The mere fact that Youngquist was present at the killing of Smith and made no effort to prevent Snoek from committing the act, is not sufficient to charge defendant with the commission of the crime he is accused of. * * * The mere fact that defendant, in time to have prevented the commission of the killing, saw that Snoek was in possession of and about to use the gun, if you find that he then did see such possession and intent to use, and that defendant made no attempt to prevent its use, will not make defendant the aider or abetter in the crime. * * * The mere fact that one is present at a homicide does not make him guilty of the crime by the mere fact that the crime was committed with his tacit mental consent or approval. The mere presence of a person when a murder is being committed, without any previous agreement or conspiracy in furtherance of the crime, such person present doing nothing by word or act to encourage or [aid in] the commission thereof, will not charge such person in any degree with the crime committed, although by interference he might have prevented it. * * * You cannot find the defendant guilty of murder in any degree unless the state has proven beyond a reasonable doubt that defendant knew or believed that Snoek intended to shoot the deceased or to kill him, and that defendant knew thereof, and with such knowledge gave encouragement and aid thereto with the view and for the purpose of causing the death of Smith."

With the vital issue in the case thus placed before the jury, a few additional facts developed at the trial may be noted from which the jury could draw inferences that active aid and encouragement came from defendant to bring about Smith's death. Of course the evidence as to defendant's knowledge of Snoek's purpose to kill Smith and defendant's giving Snoek aid or encouragement in the accomplishment of that purpose is largely circumstantial.

When the state placed Snoek on the stand in defendant's trial he refused to answer questions, invoking his constitutional privilege. Defendant was armed. He had some experience in dealing with criminals. He was an able-bodied young man, 5 feet 11 inches tall, weighing 175 pounds. He knew Snoek well, and consequently his

abnormality, if any. He could not well believe that Snoek intended on that cold night to go out to look for chickens, miles away from his home. Snoek had told him that they should go out and kill Smith, and there was some testimony that defendant's response was, "I am game if you are." Defendant at one time had had trouble in attempting to place Smith under arrest. He disliked Smith. He knew that no one had set fire to his house, yet he did not set Snoek right when the latter erroneously jumped at the conclusion that Smith had done so. He admitted seeing the pistol in Snoek's hand when he entered Smith's home, still he followed in.

The jurors were not under these circumstances compelled to accept defendant's claim that the shooting was not anticipated by him, or that he was stunned by the unexpected perpetration of a gruesome crime, or that fear of Snoek restrained him from doing what a person, being an unwilling witness to a murder, would naturally do— give the alarm. The jury were justified in giving little credence to his fear, for he admitted that when Snoek threatened to shoot him if he disclosed the crime, he promptly told Snoek that if officers of the law questioned him he would tell the truth. These are only some of the facts or circumstances available to the jury in determining whether or not defendant aided or abetted the murder.

Error is assigned on certain rulings. Mr. Lewis, the nearest neighbor of Smith, called by the state in chief, was asked whether he had observed that Smith was quarrelsome—wanted to fight. This was objected to as irrelevant and immaterial. The objection was overruled, and the answer was, "His conduct as far as I ever seen was all right." On cross-examination Lewis stated that Smith was a man that would stand up for his rights. No attempt was made to prove Smith's disposition until defendant, by the cross-examination of a previous witness for the state, without any occasion therefor, brought out an altercation that occurred between Smith and another person a few days before the former's death, and questions were so put as to suggest to the jury that Smith was a "scrapper." There was no error in the state's meeting this issue needlessly injected into the trial by defendant.

Over objection testimony was received of a conversation, over-heard between Snoek and defendant after their arrest, in which Snoek accused defendant of changing his attitude towards Smith since the arrest, in that before he always spoke of Smith in a hostile spirit, but since he maintains that Smith had never wronged him. The evidence, even that of defendant, apart from Snoek's accusation, plainly indicates a noticeable change in defendant's appraisal of the conduct and feeling existing between himself and Smith since the murder. The only vice in the testimony received was that therein Snoek expressed his opinion as to the change. We are unable to attach enough importance to Snoek's opinion to think that it in any manner influenced the verdict.

The fifth and sixth assignments of error have given us the most concern. Snoek and defendant were indicted jointly but tried separately, Snoek being tried first and convicted. No objection is made to the state's calling Snoek in this trial, nor to the refusal of Snoek to answer questions because the answers might criminate. When defendant took the stand in his own behalf he waived his constitutional right to refuse to answer the questions which might tend to convict him of the crime for which he was on trial. He could not be interrogated concerning other crimes for which he had been arrested or even indicted, unless convicted thereof, and he could be inquired of as to convictions only because a statute makes that fact evidence affecting the credibility of the witness. But he subjected himself to all proper cross-examination in relation to what he testified to on direct and touching his connection with the crime, also as to matters that might meet the inferences he wished the jury to draw from his testimony as well as to any matter properly affect-ing his credibility.

It is true that in Berg v. Penttila, 173 Minn. 512, 217 N. W. 935, we held that where the defendant was called for cross-examination by the plaintiff to establish a cause of action and he refused to an-swer the questions as incriminating, such refusal did not legitimately give rise to an inference of guilt and was not an element of proof against him. In the decision the reasoning in Phelin v. Kenderdine, 20 Pa. 354, 363, was approved which used this language:

"When a witness declines answering a question, upon the ground of its tendency to criminate himself, the objection is addressed to the court, and the decision upon it is to be made by the court, and not by the jury. If the privilege claimed by the witness be allowed, the matter is at an end. The claim of privilege and its allowance is properly no part of the evidence submitted to the jury, and no inferences whatever can be legitimately drawn by them from the legal assertion by the witness of his constitutional right."

Courts of high standing have held that a person on trial for a crime who takes the witness stand may be required to disclose that at a previous trial for the same offense he failed to deny an admission tending to prove guilt, testified to by the prosecuting witness, or that in a legal investigation in respect to that crime, when called as a witness, he claimed and was allowed the privilege of refusing to answer questions which might tend to crimination. Raffel v. U. S. 271 U. S. 494, 46 S. Ct. 566, 70 L. ed. 1054; Commonwealth v. Smith, 163 Mass. 411, 40 N. E. 189; People v. Prevost, 219 Mich. 233, 189 N. W. 92. The Raffel case on its facts is not like the one at bar, but it approves the Smith and Prevost cases.

The Smith case is perhaps not at variance with the Penttila case, 173 Minn. 512, 217 N. W. 935, for there the trial court, after allowing the prosecution to elicit on defendants' cross-examination that they had stood on their privilege when called before the grand jury which was investigating the crime for which they were on trial, charged the jury that they could not from the fact that defendants refused to answer infer guilt, but could consider that incident solely for the purpose of passing on defendants' credibility. Without passing on the correctness of the exclusion of inference of guilt the supreme court held that the admission that the defendants had claimed their privilege could be considered as affecting their credibility. It is extremely doubtful whether a jury can make such nice distinction in the use of evidence.

We cannot escape the conclusion that there was really no useful purpose served by the state in placing defendant on the witness stand in the Snoek trial, unless it was to have him claim his priv-

ilege, so as to be able to use this as proof of guilt or discredit him if he should take the stand in his own trial. Defendant had told his story to three of the county officers in the presence of Snoek and other witnesses, so that whatever Snoek's reaction to that statement was could be abundantly proved in his trial without the state's calling defendant to the stand and seemingly encouraging him then to claim his privilege. We cannot approve the course here pursued. The claim of privilege made by one under indictment, when forced by the state to be a witness in another case, is not a material fact in his trial so that, if he takes the stand in his own defense, the state should be allowed to elicit that he so did on his cross-examination.

Notwithstanding there was technical error in the incident of the trial just referred to, we are persuaded that no prejudice resulted. The questions defendant in the Snoek trial refused to answer on the ground that the answers might tend to incriminate him as shown, over his objection, in this trial, all go to facts which he fully answered in direct or cross-examination, and do not substantially differ from the statements made to the county officers about the time of the arrest. No question on the Snoek trial put to defendant asked for his participation in the killing of Smith by suggestion or encouragement, or of anticipation on his part of an intention on the part of Snoek to kill Smith, or his knowledge that Snoek even carried a gun, or of any threats by Snoek to harm Smith. In this situation it is not possible to conceive how the fact that defendant claimed his privilege in respect to the questions asked of him in the Snoek trial could prejudice him before the jury. It would be apparent to the ordinary juror that the course defendant pursued, on the advice of counsel and sustained by the court as in due exercise of his lawful right, was proper in the situation he was then in when forced by the state to be its witness in the Snoek trial.

We find no valid ground for a new trial.

The judgment is affirmed.