COMMONWEALTH *vs.* JAMES W. RICHES & another.

Suffolk.    November 9, 1914. — December 28, 1914.

Present: RUGG, C. J., BRALEY, DE COURCY, & CROSBY, JJ.

*Conspiracy. Larceny. False Pretenses. Practice, Criminal,* Conduct of trial. *Evidence,* Circumstantial, Relevancy, Competency.

At the trial of an indictment against two defendants charging that they "conspired together to steal" from persons unknown, there was evidence that one of the defendants inserted in a newspaper advertisements for a man to travel as ticket taker and treasurer, and a man to act as manager for a theatrical company, that persons who at the trial were witnesses for the Commonwealth and who were not shown to have had any knowledge of the theatrical business, at different times called upon that defendant, who in substance represented the company to be "a good proposition" under continuous and assured engagements and sent the witnesses to the other defendant; that by means of false representations as to the condition and character of the company the two defendants induced the witnesses to pay to the second defendant sums of money for a part interest in the enterprise, one of the witnesses taking an agreement from him which contained merely a transfer of that interest and a stipulation "that all representations, inducements and considerations leading" to its acceptance

were "contained fully and exclusively" therein; that the money thus received was divided between the defendants and used for their personal profit; that the company at that time was owned by the second defendant and a partner, who was not a defendant, and was bankrupt and financially a failure, as the defendants well knew, and that the witnesses never regained their money. *Held,* that the representations made by the defendants were representations of fact; and that the jury were warranted in finding that the representations were false, that there was a conspiracy participated in by both defendants acting in pursuance of a common purpose to cheat and defraud in order to obtain money by false pretenses, and that the defendants were guilty of the crime charged.

Whether, at the trial of an indictment charging two defendants with conspiring to steal, there is at the close of the evidence of one of the defendants evidence sufficient to convict him, is immaterial if, at the close of all the evidence, there is evidence sufficient to convict both defendants.

At the trial of an indictment charging two defendants with a conspiracy to steal, after evidence has been introduced which would warrant a finding that such conspiracy existed, evidence of overt acts and declarations of each of the defendants in pursuance of the common object of the conspiracy is admissible and may be used against both of them.

Where, at the trial of an indictment against two defendants charging them with a conspiracy to steal, there is evidence that as a part of a scheme to defraud in which both defendants shared one of the defendants inserted certain advertisements in a newspaper, the advertisements are admissible in evidence.

INDICTMENT, found and returned on November 8, 1913, charging that Irving F. Moore, James W. Riches and William Carlton on April 15, 1913, "conspired together to steal the property, moneys, goods and chattels of divers persons whose names and a more particular description of whom" were alleged to be unknown to the jurors.

The Commonwealth, in answer to a request of the defendants, filed specifications in substance as follows:

"That the defendants, Irving F. Moore and James W. Riches, from the date beginning the fifteenth day of April, 1913, up to the time of the finding of this indictment, conspired and agreed together to steal the property, moneys, goods and chattels of divers persons whose names and a more particular description of whom are to the Commonwealth unknown, by agreeing falsely and fraudulently to represent that a theatrical production known as 'The Purple Widow' was in good financial condition, that it was making as a profit considerable money each week, that its engagements for productions in various cities were filled, that it had no debts, that no claims existed against it, that they were *bona fide* sellers of an interest in the so called theatrical production.

"That they falsely and fraudulently conspired and agreed together to represent by means of advertisements in certain newspapers published in the city of Boston that the so called theatrical production was in need of a treasurer and a ticket seller, and that the interest that they had to sell in the so called theatrical production was substantial and real; and that in the said advertisements and representations, both in the newspapers and otherwise, the defendants and each of them were acting in good faith. All of the acts and representations set forth in this bill of particulars were done and made in pursuance of the general conspiracy and scheme to defraud."

The indictment was *nol prossed* as to Carlton. As to Riches and Moore, it was tried before *Aiken,* C. J. Material portions of the evidence and certain exceptions of the defendants to the admission of evidence are described in the opinion.

At the close of his evidence, the defendant Riches asked that the jury be instructed to return a verdict of "Not guilty" as to him. The request was refused.

The jury found both Riches and Moore guilty; and they severally alleged exceptions.

The case was submitted on briefs.

*S. R. Cutler & H. W. James,* for the defendant Riches.

*T. D. Lavelle,* Assistant District Attorney, for the Commonwealth.

CROSBY, J. This is an indictment in one count which charges the defendants with conspiracy to steal by false pretenses. Both defendants were convicted and alleged exceptions. Almost all of the questions raised by each defendant are substantially alike. The Commonwealth filed specifications which contain the material representations relied on. The defendants contend that there was not sufficient evidence to prove a conspiracy and that certain evidence was improperly admitted.

There was evidence to show that one Lemke called upon the defendant Riches by reason of an advertisement which appeared in the Boston Globe on June 1 and 2, 1913. This advertisement sought a man to travel as ticket taker and treasurer for a theatrical company, $25 to be allowed weekly for expenses, and one third of the profits. Lemke testified that Riches told him in substance that it was a theatrical enterprise and was a good

proposition; that they were booked way ahead; that it was a good show and had been running right along; that "they were making good, and it would be a real good thing for me;" that Riches asked Lemke how much money he had, and upon being informed by him that he did not have $500, Riches telephoned to Moore and then said he could pay $300 down and Moore would let the rest go and take it out of the profits of the company each week, that afterwards Riches gave him (Lemke) a card introducing him to the "Purple Widow Company," and told him "If you don't make out with Moore, come back to me." Lemke further testified that he presented the card to Moore, who showed him guarantees and telegrams and showed him bookings ahead for the company for several weeks; that Moore told him his share of the profits would be $50 a week, and that he (Lemke) was to be treasurer and ticket taker; that the show "had been making a great hit" and had been running right along and was running then; and that he (Lemke) was to receive a one third interest in the business for $500. Lemke also testified that he made a deposit of $10 with Moore, and that Moore telephoned for Riches to come up and prepare the papers; that Riches came, and Riches and Moore shook hands and Riches made the papers and they were signed by him (Lemke) and Moore and witnessed by Riches; and that he then paid Moore $290. One paper conveyed to Lemke a one third interest in the " Purple Widow Company " for $500, and contained the following provision: "It is understood and agreed that all representations, inducements and considerations leading to the acceptance of this agreement of association are contained fully and exclusively in these articles of agreement." The other paper was a partnership agreement between them to carry on the theatrical business.

Lemke joined the show at Brockton, where it stayed three days and the following three days played at Attleborough. He testified that on the following Monday Moore told him if he (Lemke) did not put in more money or assign his interest to one Carlton the show would disband and that there would be no more money to go ahead with. Whereupon he (Lemke) assigned his interest to Carlton on June 18, about sixteen days after he had paid the $300, and left the show with the understanding that such interest should be re-assigned to him. Lemke testi-

fied that all he ever received was $2.20 for meals and $5 as part salary.

There was also evidence to show that one Garno saw a similar advertisement in the Boston Globe on July 8, 1913, except that it called for a manager instead of a treasurer and ticket taker, and that on July 9, he called upon the defendant Riches who told him it was a good proposition; that he (Riches) had nothing to do with it himself; that Moore picked the company, and that he (Riches) acted only as agent; that the next day Riches took him to Moore's office and Moore told him that the Purple Widow was playing under a guarantee, as it played at all times under guarantees. Garno also testified that he made an agreement with Moore to act as manager and was to receive $25 a week and one third of the profits; that Riches was present and drew the contracts; that Moore said the show had been on the road twenty weeks and was "drawing big." Garno paid Moore $500. He testified that there was nothing given him to do, and that he remained with the show about four weeks when he left, having received altogether about $44; that he released his interest in the show to Carlton until the first day of the following November.

There was evidence that Carlton and Moore were equal owners of the show on the dates when the one third interest therein was transferred to Lemke and also when the transfer was made to Garno; that from April 15, 1913, up to the time that Lemke entered into the agreement for the purchase of a one third interest, no money had been made, that the show had not been running continuously, and that Moore was aware of these facts.

There also was evidence to show that Moore was short of money when the contract was made with Lemke and owed six months' office rent; that Moore concealed from Lemke the fact that Carlton had any interest in the business. There was evidence to show that there was no necessity for employing a manager or ticket taker, as the company's share of any receipts due from performances was paid over by the manager of the theatre where the plays were produced. There was further evidence that Moore used the $300 paid him by Lemke for his own purposes.

Carlton testified that at the time Lemke put in the $300 Moore told him (Carlton) that he had to give Riches one third or $100 of the money received from Lemke, leaving him (Moore) $200.

There was also evidence to show that Riches received a commission on the money paid by Garno to Moore. There was much evidence to show that when the foregoing representations were made to Lemke and Garno and when they invested their money this enterprise was in a bankrupt condition and financially a failure and that this condition was known to the defendants.

An examination of the testimony which is reported in the bill of exceptions shows that the jury were warranted in finding there was a conspiracy to obtain by false pretenses, from both Lemke and Garno, the money which they respectively paid in; that it was participated in by both defendants, and that they acted from a common purpose to cheat and defraud.

Whether the evidence was sufficient to establish a *prima facie* case at the close of Lemke's testimony, as the Chief Justice of the Superior Court found, is immaterial because we are satisfied that upon the whole evidence the jury were warranted in finding that a conspiracy existed between these defendants. If so, it would be sufficient. Accordingly the exceptions of the defendants to the refusal of the Chief Justice to direct a verdict in their favor must be overruled. *Commonwealth* v. *Waterman*, 122 Mass. 43, 59. The order in which the evidence should be introduced was wholly within the discretion of the presiding judge. *Commonwealth* v. *Smith*, 163 Mass. 411, 418.

While a conspiracy may be proved either by direct or circumstantial evidence, it is not often that direct evidence tending to prove the crime can be adduced, but resort must be had to circumstantial evidence, and this is the usual way of proving it. As was said by this court in *Commonwealth* v. *Smith, supra:* "The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed toward the accomplishment of the same object, especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy."

In determining the preliminary question whether an unlawful agreement was entered into, conversations, statements and conduct of the alleged conspirators are admissible only against themselves, and they are so admissible only because they are in the nature of admissions on their part. If, upon all the evidence, a *prima facie* case of conspiracy has been proved and the connection

of the defendants with the unlawful enterprise has been shown, then the overt acts and declarations of each in pursuance of the common object become the acts and declarations of all and are therefore original evidence against each of them. It is upon this principle that the presiding judge properly admitted the acts and declarations of each defendant as evidence against the other. If the jury found that a conspiracy had been entered into by the defendants, the testimony of Carlton that Moore told him he paid Riches a commission on the amount paid by Lemke was competent. For the same reason, the testimony of Lemke that Moore told him (Lemke) that Riches had sent to him (Moore) a bill for a commission of $30 was competent. The exceptions to the admission of this evidence cannot be sustained. *Commonwealth* v. *Stuart,* 207 Mass. 563, 567. *Commonwealth* v. *MacKenzie,* 211 Mass. 578.

The advertisements published in the Boston Globe, Exhibits 1, 2, 16, 17 and 18, were competent. The exceptions of the defendant Riches concede that Exhibits 17 and 18 were inserted by his procurement. These advertisements were all competent as against both defendants. They might have been found to be one of the means adopted as a part of the general unlawful scheme to defraud in which the defendants were engaged.

The testimony of Garno as to his conversations and dealings with the defendants was not incompetent, as tending to prove the commission of an independent crime within the rule as stated in *Commonwealth* v. *Jackson,* 132 Mass. 16. See also *Commonwealth* v. *Clancy,* 187 Mass. 191. While this evidence had a tendency to prove the perpetration of a fraud upon Garno by the same means as the Commonwealth contends were employed to obtain money from Lemke, still the evidence was competent to show the intent and purpose with which they acted in their relations and dealings with Lemke in carrying out a common design to defraud. *Commonwealth* v. *Farmer,* 218 Mass. 507, 512. *Commonwealth* v. *Dow,* 217 Mass. 473, 480.

The defendants contend that the representations were of a promissory nature; that they amounted to no more than dealers' talk, and are to be regarded merely as representations of value or opinions as to what the business was worth or what would be realized from it in the future by way of profits. But we do not so regard the evidence. The representations relied on by the gov-

ernment were or could be found to be representations of existing facts which were false to the knowledge of the defendants; that Lemke relied upon them as true, and that by reason thereof he was induced to part with his money. *Gurney* v. *Tenney,* 197 Mass. 457, 465.

There was no evidence to show that Lemke had any knowledge concerning the theatrical business, but there was evidence that he relied wholly upon the representations of fact made by the defendants. *Rollins* v. *Quimby,* 200 Mass. 162, 164.

What we have said disposes of most of the exceptions. We have examined all of them and discover no error as to either defendant.

*Exceptions overruled.*