COMMONWEALTH *vs.* JOHN J. KELLEY, JR.

Suffolk.   February 2, 1971. — March 18, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, SPIEGEL, & BRAUCHER, JJ.

*Conspiracy. Pleading, Criminal,* Indictment or complaint. *Evidence,* Of
conspiracy, Acts and declarations of conspirators. *Error,* Whether
error harmful. *Practice, Criminal,* Charge to jury, Objections by
counsel. *Words,* "Unlawful."

An indictment charging that K "and X did conspire together and with A,
now deceased, and with B and C, all of whom are named herein as co-
conspirators, but not as defendants," charged K as a defendant.   [85]

At the trial of an indictment for conspiracy against two defendants, where
the trial judge ruled at the close of the direct testimony of the chief wit-
ness for the Commonwealth that certain conversations with a cocon-
spirator previously admitted in evidence only against one defendant
were then admissible against the second defendant, and the evidence
as a whole warranted the jury in finding that a conspiracy existed to
which the second defendant was a party, it was immaterial whether,
at the close of the chief witness's direct testimony, the evidence was
sufficient to establish a prima facie conspiracy, and the conversations
were rightly admitted against the second defendant.   [85–86]

At the trial of an indictment against an individual who in form was an
employee of an engineering corporation for conspiracy to cause it to
pay to him large sums of money to which he was not entitled, there
was no prejudicial error in the admission in evidence of an audit of
the books of the corporation by the Internal Revenue Service and its
disallowance of salary payments to the defendant and assessment of
an additional tax against the corporation, since such evidence did not
charge any crime under the internal revenue laws and was only intro-
ductory to, and cumulative of, other evidence.   [86–87]

To sustain a conviction for criminal conspiracy where neither the ob-
ject nor the means, although unlawful, were criminal, but the unlaw-
fulness was substantial and clear and had a harmful effect upon the
public, the public interest, or some individual, it must be shown that
the defendant knew of the circumstances constituting the unlawful-
ness and causing the harm.   [87–88]

At the trial of an indictment charging that the defendant conspired with
the chairman of the Massachusetts Turnpike Authority and others "to
use the economic power of the . . . [authority] . . . to cause to be paid
to . . . [the defendant], who was then the son-in-law of the . . . [chair-
man], large sums of money to which he was not entitled, . . . by caus-
ing the award of contracts by the . . . [authority] to . . . [an engineer-

ing corporation] to be conditioned upon the . . . [defendant] being paid a salary by the . . . [corporation] . . . for which the . . . [defendant] was to do no work, and upon the . . . [defendant] becoming the owner of one-half of the outstanding common stock" of the corporation, a finding that the award of contracts was conditioned as specified in the indictment was warranted by the evidence [89–90]; and evidence warranted findings that the defendant knew that the award was conditioned as specified in the indictment, knew the circumstances which rendered the objective of the scheme and the means by which it was accomplished unlawful, and knew that the harm caused to the public thereby was contrary to the public interest; and there was no error in denial of the defendant's motion for a directed verdict. [91–92]

At the trial of an indictment for conspiracy, there was no error in the judge's charge in that he ruled as a matter of law that certain conduct was unlawful where he left to the jury the question whether the defendant participated in such conduct. [93]

At the trial of an indictment, there was no error in the judge's charge in that he refused the defendant's request for certain rulings, one of which the judge said was "good law, but inapplicable" [93]; one of which, respecting the drawing of inferences as distinguished from engaging in conjecture, the judge adequately covered in his charge [93]; one of which, that disbelief of testimony did not constitute proof of a contrary fact, as relevant to the impeachment by the Commonwealth of its own chief witness, the judge covered at the time of the impeaching testimony and later in his charge [93–94]; and one of which could be read as invading the jury's province of drawing reasonable inferences [94].

At the trial of an indictment for conspiracy at which the judge fully instructed the jury and stated that "the crucial question" was whether the defendant "knew what was going on" during the period of the conspiracy, there was no error in the refusal of additional instructions which would not have clarified the issues. [94–95]

There was no error at the trial of an indictment in the judge's reading to the jury portions of *Commonwealth* v. *McLaughlin*, 352 Mass. 218, concerning needless interruptions by counsel, where the defendant's counsel made numerous objections to questions, some before completion thereof and many after the judge stated he would save counsel's rights and asked him not to interrupt, and where many of the large number of exceptions taken were repetitious. [95]

INDICTMENT found and returned in the Superior Court on April 22, 1965.

The case was tried before *Forte, J.*

*Walter J. Hurley (John L. Murphy, Jr.* with him) for the defendant.

*Ruth I. Abrams*, Assistant Attorney General, for the Commonwealth.

BRAUCHER, J.   The defendant was charged, in an indictment returned April 22, 1965, with the crime of conspiracy. He was tried before a jury, convicted and sentenced, and the case is here on his exceptions.   Sentence was stayed by the trial judge pending his report to this court of questions on the sufficiency of the indictment.   Those questions were answered in *Commonwealth* v. *Kelley,* 358 Mass. 43.[1]   The exceptions relate to (1) denial of the defendant's motion to quash the indictment, (2) the trial judge's ruling that a prima facie conspiracy had been established, resulting in the admission as evidence against the defendant of the acts and declarations of alleged coconspirators, (3) admission of evidence of a crime not charged in the indictment, (4) denial of the defendant's motion for a directed verdict, (5) denial of the defendant's requests for instructions to the jury, and (6) conduct of the trial judge reflecting adversely on objections made by the defendant's counsel.

## THE INDICTMENT.

The indictment charged that: "John J. Kelley, Jr., and Highway Traffic Engineers, Inc., a Massachusetts Corporation, . . . did conspire together and with William F. Callahan, now deceased, who was then an executive officer of the Commonwealth to wit; the Chairman of the Massachusetts Turnpike Authority, . . . and with Edgar F. Copell and Thomas D. Connolly, all of whom are named herein as co-conspirators, but not as defendants, to use the economic power of the said Massachusetts Turnpike Authority . . . to cause to be paid to the said Kelley, who was then the son-in-law of the said Callahan, large sums of money to which he was not entitled; by the following means: by causing the award of contracts by the said Massachusetts Turnpike Authority to the said Highway Traffic Engineers, Inc.,

---

[1] A codefendant, Highway Traffic Engineers, Inc., was found guilty at the same trial, but was not involved in the report and is not before us here.

to be conditioned upon the said Kelley being paid a salary
by the said Highway Traffic Engineers, Inc., . . . for which
the said Kelley was to do no work, and upon the said Kelley
becoming the owner of one-half of the outstanding common
stock of the said Highway Traffic Engineers, Inc. . . .; by
the request and acceptance by said Callahan of a promise
to do an act beneficial to him under an agreement and with
an understanding that the vote, opinion and judgment of
the said Callahan would be given in a particular manner
and on a particular side of a question, cause and proceeding,
which was or might be by law brought before him in his
official capacity, and as consideration for speech, work and
services in connection therewith; . . . ."

Portions of the indictment omitted from the above quota-
tion charged as additional "means": (1) that Kelley was to
receive salary from two additional corporations, Denman
Electronics Corp. (Denman) and Highway Equipment Co.,
Inc. (Equipment), as well as from Highway Traffic Engin-
eers, Inc. (Traffic), (2) that he was to become an owner of
stock in all three corporations, and (3) stealing money of the
Massachusetts Turnpike Authority (Authority). At the
close of the evidence the Commonwealth conceded that no
evidence of larceny by the defendant was introduced at the
trial, and the judge instructed the jury not to consider the
part of the indictment referring to stealing. He also charged
the jury that he had allowed evidence about Equipment and
Denman "merely to give you the advantage of getting the
whole picture . . . ."

In answer to the questions reported by the judge, this
court made several rulings. *Commonwealth* v. *Kelley,* 358
Mass. 43, 45–49. (1) "The sufficiency of the indictment
does not depend upon whether evidence of larceny is pre-
sented at the trial. . . . It is sufficient if the evidence
establishes any of the means alleged." (2) "Thus, the means
as described in the indictment, would constitute crimes under
G. L. c. 268, §§ 8 or 9,[2] if William F. Callahan was then an
executive officer of the Commonwealth; and they would
constitute a crime under G. L. c. 271, § 39,[3] if he was not

then an executive officer of the Commonwealth." (3) "We also hold that the object of the conspiracy was illegal and involved great danger to the public interest. . . . The conduct described in the indictment's allegation of the means for the accomplishment of the object of the conspiracy is impermissible and legally indefensible in the transaction of public business. The alleged object of this conspiracy, the subversion for private profit of the power of public office, is as unlawful as the means alleged."

## THE PROOF.

There was evidence of the following. Callahan was chairman of the Authority from 1952 to 1964, and usually presided at meetings. Kelley, the defendant, was Callahan's son-in-law at all relevant times. There was no competitive bidding so far as engineering contracts were concerned. Six-

---

[2] Section 8: "[An] . . . executive . . . officer who corruptly requests or accepts a . . . promise . . . to do an act beneficial to him, under an agreement or with an understanding that his vote, opinion or judgment shall be given in any particular manner, or upon a particular side of any question, cause or proceeding, which is or may be by law brought before him in his official capacity or as a consideration for any speech, work or service in connection therewith . . . shall . . . be punished . . . ." Section 9: "An officer or agent of, or a person employed by, the commonwealth, or . . . by any public institution not . . . [a prison, house of correction, state hospital or other public charitable institution] who, being authorized . . . to employ service or labor, receives, directly or indirectly, for himself or for another, a commission, discount, bonus, present or reward from the person who makes such contract, . . . or from a person who renders service or labor under such contract, and a person who gives or offers such commission, discount, bonus, present or reward, shall be punished . . . ." Both sections were repealed by St. 1962, c. 779, § 3, effective May 1, 1963. The repeal did not invalidate indictments for conspiracy to commit acts in violation of the repealed sections alleged to have taken place before the effective date of repeal. G. L. c. 4, § 6, Second. *Commonwealth* v. *Benoit*, 346 Mass. 294.

[3] "Whoever corruptly gives, offers or promises to an agent, employee or servant any gift or gratuity whatever, with intent to influence his action in relation to the business of his principal, employer or master; or an agent, employee or servant who corruptly requests or accepts a . . . promise . . . to do an act beneficial to himself, under an agreement or with an understanding that he shall act in any particular manner in relation to the business of his principal, employer or master; or an agent, employee or servant who, being authorized . . . to employ service or labor for his principal, employer or master, receives directly or indirectly, for himself or for another, a commission, discount or bonus from the person who makes such . . . contract, . . . or from a person who renders such service or labor; and any person who gives or offers such an agent, employee or servant such commission, discount or bonus, shall be punished . . . ."

teen contracts with Traffic were approved by the Authority between July 14, 1954, and July 11, 1963. Most such contracts were first approved by the chief engineer of the Authority, but he was not consulted on the first four contracts with Traffic. The first contract, approved July 14, 1954, was received by Traffic about August 10, 1954. During 1955 to 1961 Traffic's gross receipts were about $2,800,000, and eighty-five per cent to ninety per cent of its work came from the Authority.

Copell, the chief witness for the Commonwealth, was a registered engineer and from 1954 to 1965 was president and project engineer for Traffic; its treasurer was Thomas D. Connolly (Connolly). In 1953 the officers of Traffic were Connolly and two others of that name; Copell was a consultant and solicited business for them. Traffic's gross receipts were $2,895.76 in 1953, $34,554.52 in 1954. Copell had worked for the Department of Public Works and had been in close association with Callahan, and had known the Connollys for twenty years. In the spring of 1954, Copell visited Callahan at the offices of the Authority to solicit business for Traffic.

After several such visits Copell had received no work. Then on one occasion Callahan said, "We will give you some work." Then Callahan said, "I think you ought to have a partner." Copell said, "Well, what do I need a partner for?" Callahan said, "Well, . . . I don't know . . . I think it would be well to have a partner. You ought to need some help out there to carry on, and so forth." Copell talked it over with Connolly; the Connollys thought it over and later agreed; and Copell informed Callahan that they had agreed. At the next two or three meetings with Callahan, Copell asked who the partner was to be but Callahan said he didn't know. About a week before August 4, 1954, Callahan told Copell the partner was to be Kelley, that Kelley should have fifty per cent of the stock but share equally with Copell and Connolly in the profits, receiving one-third. At this time Traffic had received no contracts from the Authority.

On August 4, 1954, Kelley met with Copell and Connolly for a sale and redistribution of the outstanding shares of stock in Traffic. Kelley paid $2,000 for 100 shares, and Copell and Connolly each paid $1,000 for fifty shares. This meeting was the first time Copell had seen Kelley in maybe eight to ten years. Copell did not know how Kelley happened to be there; there was no conversation that he recalled except that of welcoming Kelley into the fold. At the time, Traffic was a going business. Kelley was not an engineer.

During 1955 and 1956 Kelley was retained by Traffic as a consultant to locate service areas along the turnpike; he participated in one report and received a total of $20,000 for both years. Another company submitted a final report in November, 1955. In 1957–1961 Kelley, Copell and Connolly were carried as weekly employees, but Kelley did no work for Traffic during that time; each received approximately $400 a week. At the end of each year Kelley would attend an annual meeting of the stockholders and officers of Traffic. Copell never discussed salary with Kelley except for the first consultation on service areas, and never spoke to him about his work for Traffic.

In 1960 the Internal Revenue Service (IRS) conducted an audit of the books of Traffic and assessed an additional tax based in substantial part on disallowance of nearly $33,000 of salary paid to Kelley for 1956, 1957 and 1958. Kelley was told of the IRS action; the matter was not discussed with him. Copell told Callahan, "I felt we should have some help in paying this assessment," and Callahan said, "No, it is only money, get it up." Copell said Traffic did not have the money, and Callahan said, "Go out and get it; you can get it." Traffic paid the additional tax, and Kelley never paid it back to Traffic. Callahan agreed to the reduction of Kelley's participation to $12,000, and Kelley's salary was reduced to $12,000 without discussion with Kelley.

On one occasion Callahan asked Copell why Kelley hadn't received his check. Copell said funds were not forthcoming

from the Authority. Callahan said he would expedite things and added, "You have agreed; live up to it. Get it up; and pay him."

About 1960 or 1961 Copell told Callahan that Kelley should leave Traffic because there was a conflict of interest law on the books which made it impossible to continue with Kelley. Later Callahan said, "I've talked with the attorneys and John, we agree, should resign." He also said Kelley's 100 shares were worth $36,000. Copell replied that he thought that was high and that they didn't have that kind of money. Callahan told him they could get it and to dig it up. In August, 1961, Traffic, which then had assets of $80,000, agreed to purchase Kelley's stock on an instalment basis for $36,000. The agreement was subsequently substantially performed, Kelley having discounted the note in April, 1964. The terms of the agreement were agreed to by Callahan and Copell; Copell never spoke to Kelley about it.

When Copell and Connolly became interested in Equipment, Callahan asked Copell, "How about John [Kelley]?" Callahan said he thought John should be in on it with them, Copell reported that to Connolly, and John joined them and became a stockholder. Kelley attended a meeting to form the corporation, but Copell never discussed the formation with Kelley or spoke to Kelley about his stock participation. Copell, Kelley and Connolly each had one-third ownership; in 1958 Kelley received $2,000 from Equipment. Kelley did no work for Equipment.

In December, 1958, Copell and Connolly bought into Denman, and later Copell told Callahan about it. Callahan asked "if he didn't think John would like to be in it with them," and said, "I suggest that John — it would be all right to take Johnny with you and go along as you have with the other affairs." Later Connolly agreed, and Kelley became a stockholder in Denman. Kelley did no work for Denman.

## THE EXCEPTIONS.

1. *The motion to quash.* The defendant excepted to the denial of his motion to quash the indictment. Several questions relating to the sufficiency of the indictment were disposed of in *Commonwealth* v. *Kelley, supra.* The contention now made, that the indictment does not charge Kelley as a defendant but states that he is a coconspirator and not a defendant, is very nearly frivolous. The indictment, quoted above, is in the form "Kelley and X did conspire together and with A, now deceased, and with B and C, all of whom are named herein as co-conspirators, but not as defendants." On the plainest principles of grammar, the "whom" in question are A, B and C and not Kelley or X. The phrase "all of whom" was apparently used instead of "who" to make clear that the deceased A was not named as a defendant. There is no ambiguity; and if there were it could not have misled anyone. See G. L. c. 277, § 34; *Commonwealth* v. *Pray,* 13 Pick. 359, 363; *Turns* v. *Commonwealth,* 6 Met. 224, 234.

2. *Prima facie conspiracy.* Evidence of the conversations with Callahan was originally admitted only against Traffic. At the close of Copell's direct testimony the judge ruled and instructed the jury that this evidence was now admissible against Kelley. The defendant excepted to this ruling, which was renewed in the charge to the jury.

"The case was tried in the manner in which conspiracy cases are customarily tried, by allowing in the first instance as against each defendant separately evidence of such acts, knowledge and admissions as appear to affect the particular defendant and then, when sufficient evidence has accumulated to support a fair inference of the existence of a conspiracy, by removing the limitation, so that evidence of the acts, knowledge and admissions of all who are found to have joined in the conspiracy, during the course of and in pursuance of the conspiracy, becomes applicable against all the conspirators. *Commonwealth* v. *Riches,* 219 Mass. 433, 438. *Commonwealth* v. *Dyer,* 243 Mass. 472, 507. All this was

carefully explained in the judge's charge." *Commonwealth* v. *Benesch*, 290 Mass. 125, 132–133. *Commonwealth* v. *Kiernan*, 348 Mass. 29, 57–58, cert. den. sub nom. *Gordon* v. *Massachusetts*, 380 U. S. 913. *Commonwealth* v. *Stasiun*, 349 Mass. 38, 50–51. *Commonwealth* v. *Monahan*, 349 Mass. 139, 154. *Commonwealth* v. *French*, 357 Mass. 356, 379–380.

"In making this determination, the conspiracy may be, and usually is, proved by circumstantial evidence. *Commonwealth* v. *Smith*, 163 Mass. 411, 417–418. *Commonwealth* v. *Benesch*, 290 Mass. 125, 131. Every piece of evidence by itself does not have to be sufficient to prove the main point at issue. *Attorney Gen.* v. *Pelletier*, 240 Mass. 264, 314. 'Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and in turn may corroborate the conclusion which would be drawn from the other facts.' *Commonwealth* v. *Mulrey*, 170 Mass. 103, 110. *Commonwealth* v. *Coyne*, 228 Mass. 269, 272." *Commonwealth* v. *Stasiun*, *supra*.

If we are satisfied that upon the whole evidence the jury were warranted in finding that a conspiracy existed to which the defendant was a party, it is immaterial whether the evidence was sufficient to establish a prima facie case at the close of Copell's direct testimony, as the trial judge ruled. *Commonwealth* v. *Riches*, 219 Mass. 433, 438. We discuss below, in connection with the motion for directed verdict, the question whether the evidence warranted such a finding.

3. *Evidence of the IRS audit.* The defendant excepted to the admission of evidence that the IRS in 1960 audited Traffic's books, disallowed salary payments to Kelley, and assessed an additional tax against Traffic. He claims that the evidence was unnecessary, merely cumulative, remote and prejudicial, and that it was evidence of a crime independent of the one charged in the indictment, citing *Commonwealth* v. *Howard*, 205 Mass. 128, 148; *Commonwealth* v. *Stone*, 321 Mass. 471, 473; *Commonwealth* v. *Valcourt*, 333 Mass. 706, 717–718; *Commonwealth* v. *Banuchi*, 335 Mass. 649, 654; *Commonwealth* v. *Burke*, 339 Mass.

Commonwealth *v.* Kelley.

521, 533–534.  We do not see that there was any charge of crime under the internal revenue laws.  The judge offered to explain to the jury that an audit by IRS does not necessarily show wrongdoing.  The evidence provided background for a conversation between Copell and Callahan which led to a reduction in the amounts paid to Kelley.  As the judge said, the evidence was only introductory, and originally it was not admitted against Kelley.[4]  Later in the trial similar evidence was admitted as part of a conference at which Kelley was present.  This evidence was somewhat cumulative, and we are of opinion that there was no prejudice to the defendant.  *Commonwealth* v. *Ries,* 337 Mass. 565, 584.

4. *The motion for directed verdict.*  We have taken note of "adverse criticism of the general principle that a criminal conspiracy may exist where neither the means nor the purpose of an alleged conspiracy, although unlawful, would be criminal if done by an individual."  *Commonwealth* v. *Bessette* (No. 1 of 1966), 351 Mass. 148, 152 n.  We therefore limited the term "unlawful" to "a narrow range of situations,  (a) where there is strong probability . . . that the execution of the plan by group action will cause such significant harm to an individual or to the general public, as to be seriously contrary to the public interest, and (b) where the unlawfulness of objective or contemplated means is substantial and clear."  *Id.* at 154.  *Commonwealth* v. *Bessette* (No. 2 of 1966), 351 Mass. 157, 162.  Where the charge is "conspiracy to commit an offence which . . . is *malum prohibitum* only, . . . it must appear that the defendant knew of the illegal element involved in that which the combination was intended to accomplish."  *Commonwealth* v. *Benesch,* 290 Mass. 125, 134–135.  Compare *Commonwealth* v. *O'Rourke,* 311 Mass. 213, 220–221.  We think

---

[4] The judge said, "It is not admissible against Kelley at this moment, and it is only introductory.  Because what an agent of the Internal Revenue thinks is not important here and not admissible and should not be considered by the jury.  It is all hearsay.  If it is leading up to something else that is admissible or introductory to something else, I will allow it; but not against Mr. Kelley up to this point."

it must similarly be shown, in a prosecution in the "narrow range of situations" referred to in the *Bessette* cases, that the defendant knew of the circumstances which satisfied the requirements of harm and unlawfulness laid down in those cases.

In the present case the indictment charges a conspiracy using both criminal means and means which fell within the *Bessette* principle. "It is sufficient if the evidence establishes any of the means alleged." *Commonwealth* v. *Kelley*, 358 Mass. 43, 46. In his charge to the jury, the judge stated that "the gist of this indictment is that a scheme, a plan was agreed upon, by which Mr. Callahan was to exercise whatever influence and power he had in the form of giving business to the corporation, Highway Traffic Engineers, Inc., and in exchange for that Mr. Kelley was to get the privilege of becoming part owner of the Highway Traffic Engineers, Inc., and was to get money for doing nothing." He also quoted from the second *Bessette* case, and did not require the jury to find a means or purpose which would be criminal if done by an individual. In analyzing the sufficiency of the evidence, therefore, we treat this as a case subject to whatever limitations are appropriate to cases within the *Bessette* principle. We also bear in mind the general critique of conspiracy as an offence — "the danger of a dragnet in the broad, uncertain ground of liability, the wholesale joinder of defendants, the imposition of vicarious responsibility, the relaxation of the rules of evidence, or some or all combined." Am. Law Inst., Model Penal Code, § 5.03, comment, pp. 96–97 (Tent. draft No. 10, May 6, 1960). The jury are permitted to draw rational inferences from the evidence, but no essential element of the crime may rest in surmise, conjecture, or guesswork. *Commonwealth* v. *O'Brien*, 305 Mass. 393, 401. *Commonwealth* v. *Fancy*, 349 Mass. 196, 200. *Commonwealth* v. *Ancillo*, 350 Mass. 427, 432–433. *Commonwealth* v. *Smith*, 350 Mass. 600, 607.

The sufficiency of the evidence is attacked in two principal respects: (a) the showing that the award of contracts

by the Authority was conditional upon Kelley's being paid a salary by Traffic for which Kelley was to do no work, and (b) the showing that Kelley had knowledge that the award was so conditioned. We discuss the two points separately.

a. *The conditioning of the award of contracts.* From Copell's testimony as to his conversations with Callahan and Connolly in July, 1954, before Traffic had received any contracts, the jury could have found that Copell was seeking contracts for Traffic, that Callahan indicated to him that such contracts would be awarded, that part of the transaction would be the taking in of a partner to be designated by Callahan, that Copell and Connolly agreed to this, and that Callahan later named Kelley as the partner and directed that he receive one-third of the profits. There was also evidence that the plan was carried out. On August 4, 1954, Kelley paid $2,000 for stock in Traffic, he was not an engineer and did no work for Traffic except for one report in 1955–1956, yet from 1957 to 1961 he received about $400 a week (about $20,000 a year, reduced to $12,000 in 1960). In August, 1961, Traffic agreed to pay him $36,000 for his stock. Meanwhile, Traffic received its first contract from the Authority about August 10, 1954, and received fifteen more contracts through 1963.

The relationship of exchange between the contract awards and the Kelley participation was supported also by evidence that Copell originally thought he did not need a partner, by the fact that both Callahan and Copell were vague as to why Copell needed a partner, and by the peremptory tone of Callahan's later instructions to Copell; with reference to money to pay a tax deficiency, "Go out and get it; you can get it"; with reference to a payment to Kelley, "You have agreed; live up to it. Get it up; and pay him"; with reference to the amount to be paid for Kelley's stock, "they could get it and to dig it up," characterized by the witness as "rather adamant." The fact that Callahan's wishes in these matters were carried out furnishes further corroboration. As against Callahan, Copell, Connolly and Traffic,

there was ample evidence that the contract awards were conditioned on Kelley's participation.

The defendant argues that the only direct evidence on this point was Copell's testimony on cross-examination that he took Kelley into Traffic as a favor to Callahan, and that Copell's position had always been that the awarding of contracts was never conditioned upon the acceptance of Kelley as a partner. The Commonwealth was permitted to impeach this testimony by a prior inconsistent statement, and the jury were not required to believe it.

The defendant argues that the first two contracts were approved by the Authority on July 14 and 21, several weeks before Kelley's participation began and before any conversations as to a need for a partner. Therefore, he says, it should be inferred that the contracts were not awarded on the condition precedent, citing *Commonwealth* v. *Albert,* 307 Mass. 239, 243–244. The chronology is not crystal clear, but it appears that the conversations took place over a period of time ending about a week before August 4, 1954, that Kelley became part of Traffic on August 4, 1954, and that the contracts were transmitted to Traffic by a letter dated August 6, 1954, and received about August 10, 1954. In any event, there were fourteen more contracts over a period of some nine years. The judge instructed the jury, by reason of the statute of limitations (G. L. c. 277, § 63), to limit themselves to the period from April 23, 1959, to the end of the conspiracy in 1960 or 1961. There was ample evidence to support a finding that by 1959 the pattern was one of quid pro quo.

b. *Kelley's knowledge.* Copell's testimony indicated that Kelley was not originally a party to the agreement between Callahan, Copell, Connolly and Traffic, and there is no evidence of any independently criminal act on his part or any admission by him that he shared their common purpose. The defendant contends that the evidence shows only the creation of a routine, typical investment and a bona fide business relationship between Kelley and Copell, and that this case is a feeble attempt by the Commonwealth to impose

criminal liability on a stockholder for attempting to mini-
mize Federal income taxes by taking dividends in the form
of wages.

The critical question is whether "the connection of"
Kelley "with the unlawful enterprise has been shown."
*Commonwealth* v. *Riches*, 219 Mass. 433, 438–439. We think
there was sufficient proof indicating "concerted action
toward the accomplishment of a common purpose." *Com-
monwealth* v. *Galvin*, 310 Mass. 733, 745. *Commonwealth* v.
*Beal*, 314 Mass. 210, 221. As the trial judge said in making
his ruling that the conversations with Callahan were then
admissible against Kelley, "as a result of those conversa-
tions, somehow Kelley appeared. He appeared at the meet-
ings, said nothing; got his·check when a check was due him,
said nothing; sold his stock for . . . [$36,000] without argu-
ment or discussion. . . . Now, you have a right to infer,
if you see fit, to infer that somebody told him about these
negotiations. . . . If you want to draw that conclusion —
and you don't have to — you can draw the conclusion that
it was Mr. Callahan that told him when to appear for or-
ganization. When and where to appear, sell his stock. When
to appear to organize corporations. When to appear to get
his check, and so forth. So that he, his mind worked with
the minds of the others in this plan of organizing and doing
business and getting a salary every week and doing nothing
for that salary."

The inferences thus suggested could be reinforced by other
facts in evidence. From August, 1954, when Kelley first
appeared on the scene, until August, 1961, when he agreed
to sell his stock, was about seven years. Although in form
he was a stockholder, a consultant, and then an employee of
Traffic, and never an officer or director, in substance he was
a partner. He had a one-third share in a firm which aver-
aged $400,000 receipts each year for seven years, doing
eighty-five per cent to ninety per cent of its work for the
Authority, of which Kelley's father-in-law was chairman.
See *Commonwealth* v. *David*, 335 Mass. 686, 693–694. We
think the evidence justified the inference that Kelley knew

that there was an agreement between Callahan and Traffic, knew its essential nature, knew of the strong probability that its execution by group action would cause such significant harm to the general public as to be seriously contrary to the public interest, and knew that the unlawfulness of the objective and the contemplated means was substantial and clear. See *Commonwealth* v. *Bonomi*, 335 Mass. 327, 355–356, and cases cited; *Commonwealth* v. *Kiernan*, 348 Mass. 29, 55–56; *Commonwealth* v. *Holiday*, 349 Mass. 126, 128–129. There was no error in the denial of his motion for a directed verdict.

5. *The charge to the jury.* The defendant presented to the judge forty-eight numbered requests for instructions to the jury. The judge indicated that he would grant all but about fourteen, but not in the language proposed by the defendant. After the jury had been charged the defendant took forty-one exceptions to refusals of his requests. He now claims that the charge was defective in six respects, involving ten of his requests.

The test of the charge is the impression created by it as a whole. *Commonwealth* v. *Pinnick*, 354 Mass. 13, 15. The judge was not bound to instruct in the exact language of the requests. *Commonwealth* v. *Lussier*, 333 Mass. 83, 93. *Commonwealth* v. *Devlin*, 335 Mass. 555, 569. While a defendant, in a criminal case, is entitled to have the issues of fact clearly presented to the jury and the law applicable thereto carefully explained, the method and extent of the charge must be left to the discretion of the judge. It is not to be expected that he shall discuss every subsidiary fact and possible inference. *Commonwealth* v. *Greenberg*, 339 Mass. 557, 584–585. *Commonwealth* v. *Monahan*, 349 Mass. 139, 170–171. We have reviewed the charge in the light of these principles and the defendant's requests, exceptions and arguments, and find no error.

a. *Fact and law.* After reading from the second *Bessette* case, 351 Mass. 157, 162, the judge charged the jury "that for Mr. Callahan to suggest that his son-in-law be made a part owner of a corporation in exchange for contracts with

the Authority . . . [and] as part of that plan, for some individual . . . to get $400 a week . . . for doing nothing . . . each of those incidents may not be criminal in themselves, but . . . I rule it does have serious, injurious effect of substantial magnitude upon the public.

"It is of public interest and of some individuals. It is not the money of the Commonwealth and not the money of the Authority, because the Authority got its money's worth, but the money of this corporation. If that money didn't go to Mr. Kelley, the defendant, where would it be? It did have that effect on that corporation. That's my ruling."

The defendant claims that by this ruling the judge took a question of fact from the jury. It is not clear that the point now being argued was adequately called to the attention of the judge. But in any event, we think the judge was right. He anticipated our ruling in *Commonwealth* v. *Kelley*, 358 Mass. 43, 49. "The conduct described in the indictment's allegation of the means for the accomplishment of the object of the conspiracy is impermissible and legally indefensible in the transaction of public business. The alleged object of this conspiracy, the subversion for private profit of the power of public office, is as unlawful as the means alleged." That ruling was made as a matter of law. Whether the conduct took place was for the jury; whether it was permissible or unlawful was for the court.

b. *Conflict of interest.* The defendant excepted to the denial of his request to charge that this was not a conflict of interest case. The judge aptly said: "You might put . . . 'This is not a murder case.' . . . It is good law, but inapplicable."

c. *Inferences.* The defendant requested a charge that the jury could draw "no inference which is based upon another inference" and "no inference which is contrary to the facts introduced into evidence." We agree with the judge that he had adequately charged that reasonable inferences could be drawn, but not matter of conjecture or guess.

d. *Disbelief not affirmative proof.* The defendant requested a charge that disbelief of testimony does not constitute

proof of a contrary fact, and argues that this was necessary in view of the impèachment by the Commonwealth of its own chief witness. The judge correctly thought he had covered the point. At the time of the impeaching testimony he instructed the jury that it had no probative value and related only to the credibility of the witness. Later, in his charge, he again related the inconsistent statement to the evaluation of the testimony of the witness, explaining that the jury could reject his testimony in whole or in part.

e. *Evidence reasonably supporting two conclusions.* The judge amply instructed the jury that guilt must be established beyond a reasonable doubt. He refused to add: "If two conclusions can reasonably be drawn from the evidence, one of innocence, and one of guilt, the jury should adopt the one of innocence." The requested charge could be read to invade the jury's province of drawing reasonable inferences, and was properly refused.

f. *Criminal intent.* The judge's charge included the following, after a discussion of the question whether there was an illegal combination or conspiracy between Copell and Callahan to which the corporation Traffic was a party: "Was Mr. Kelley a member of this combination? Did he know about it? If he did and joined it, he is guilty. If there is a reasonable doubt about it, he is not guilty." The defendant requested instructions that Kelley must have acted "willfully," "with a corrupt intent," and "with the specific purpose of violating the law." He also requested an instruction that "knowledge of Kelley," as given in the charge, meant knowledge of an agreement between Copell and Callahan that the condition for awarding contracts would be the offer of stock ownership and money to Kelley, and an instruction that throughout the conduct of Kelley there must be a criminal intent; that is, a corrupt intent to do an illegal act. To the denial of these requests, the defendant excepted.

The judge had fully instructed the jury as to the nature of conspiracy, the type and degree of proof required, the doctrine of reasonable doubt, and the question of guilt. He

had told them, "I think the crucial question in this whole case is whether Mr. Kelley knew what was going on, from 1959, April 23d, to sometime in 1961." The additional requested instructions would not have clarified the issues to be decided. The defendant's argument on this point seems to be primarily directed to the sufficiency of the evidence, which we have discussed above, rather than to any possible misunderstanding by the jury.

6. *The conduct of the judge.* The defendant complains of the action of the judge in reading to the jury from *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 227–229, on the subject of needless interruptions. The judge then said he had read it as "a guide to counsel for future actions. There are no complaints so far." Later in the trial, after asking that a question be repeated, the judge said, "I don't want you interrupted so that the chain of thought is broken. I read that paragraph . . . from the Supreme Court decision . . . last week, and that is what I have in mind."

There was no error. Counsel at the time of the second incident had made numerous objections, some before the question had been completed. He had taken some 165 exceptions, many of them repetitious. The court had permitted the Commonwealth to impeach its chief witness with prior inconsistent statements, relying on G. L. c. 233, § 23. Counsel excepted to the ruling and to the court's reading of the statute to the jury. He then objected to each question asked. The judge said he would save counsel's rights, and asked him not to interrupt, but counsel continued to object to each question. The judge was merely doing his duty in trying to prevent the course of testimony from being unduly broken and confused.

*Exceptions overruled.*