COMMONWEALTH *vs.* WILLIAM G. KURTH & others.

Essex. April 5, 1971. — June 29, 1971.

Present: TAURO, C.J., SPALDING, SPIEGEL, QUIRICO, & BRAUCHER, JJ.

*Conspiracy. Practice, Criminal,* Conspiracy case.

At the trial of an indictment for conspiracy against three defendants, where the evidence was originally limited in its application to one or another of the defendants and the limitation was unchanged when separate motions by them for directed verdicts were heard, the judge was then required to rule on the motions only on the basis of such limitation on the evidence [730–731]; after denial of the motions instructions by the judge which permitted the jury in certain circumstances to disregard the limitation could not be considered by this court in determining the sufficiency of the evidence to warrant the denial of each motion. [736]

At the trial of an indictment against three defendants for conspiracy to murder the wife of one of the defendants, where the only relevant evidence came from a banker and two police officers and consisted of testimony of words and conduct limited in its application to one or another of the defendants, and the only reference to killing anyone was a statement by one of the defendants other than the wife's husband, admitted against the speaker only, that the husband had asked him to put someone's body in a car and burn the car, and, although there was evidence about the husband paying $10,000 to another defendant, described as a "big fellow," and a demand by the third defendant to the husband to bring another $10,000 "or the big fellow would get him," there was no evidence which permitted an inference that the three defendants had entered into an agreement to murder the wife, it was held that denial of separate motions by the defendants for directed verdicts was reversible error. [736–737]

INDICTMENT found and returned in the Superior Court on May 12, 1967.

The case was tried before *Bennett, J.*

*Wilbur G. Hollingsworth* for the defendant Kurth.

*Joel R. Labell* for the defendants Kaplan and Gugliucci.

*Howard J. Camuso,* Assistant District Attorney, for the Commonwealth.

QUIRICO, J. On May 12, 1967, the defendants, Pat

Gugliucci, George Kaplan and William G. Kurth were indicted for the crime of conspiracy to murder Kurth's wife, Barbara Kurth. They were tried together on this indictment and were found guilty and sentenced on March 6, 1969. The case is before us on the defendants' three separate bills of exceptions. The bills of Gugliucci and Kaplan are identical in all material portions thereof, and the bill of Kurth is substantially similar to the other two. Additional indictments returned against Gugliucci and Kaplan arising out of the same set of events as the conspiracy indictment have not been tried and are not involved in this decision.[1]

The principal claims of errors by the three defendants relate to the following action by the trial judge: (a) the denial of their motions for directed verdicts of not guilty, and (b) rulings and instructions to the jury on the applicability of evidence of the statements or conduct of one alleged conspirator against the other alleged conspirators, with particular reference to statements or conduct during police interrogation just prior to or following arrest.

The entire evidence in this case consisted of the testimony of three persons. They were Harry Godden, a banker, and James Leary and Arthur Jowett, both State police officers. While a third State police officer testified, his testimony was limited to the fact that he was at the police station on the evening the defendants and the other officers were there in connection with the investigation of this case. The defendants did not testify and they presented no evidence. They rested at the close of the Commonwealth's case, and each then filed a motion for a directed verdict of not guilty. After a hearing, the three motions were denied.

The evidence consisted of testimony of witnesses who described the words and conduct of one or more of the defendants. Most of the statements attributed to each of the

---

[1] On May 12, 1967, Gugliucci was indicted for the crime of threatening Kurth with intent to extort money from him, and Kaplan was indicted for the crimes of being an accessory before the fact and after the fact to the crime charged against Gugliucci. On May 10, 1969, Kaplan and Gugliucci were indicted for the crime of stealing money of the value of more than $100 of the property of Kurth.

defendants were made in the absence of the other defendants. With minor exceptions hereinafter noted, when testimony was admitted it was limited in application to a specified one of the three defendants, and those limitations had not been changed when the judge denied the motions for directed verdicts. The judge was therefore required to rule on each motion separately on the basis of the evidence which had been admitted as to the moving defendant considered in its light most favorable to the Commonwealth. The question raised by each motion was whether there was sufficient evidence of the guilt of the defendant making the motion to warrant the submission of the case against him to the jury. *Commonwealth* v. *Altenhaus*, 317 Mass. 270, 271. *Commonwealth* v. *Baron*, 356 Mass. 362, 365. For the purpose of our consideration of this question we shall summarize separately the evidence admitted against each of the three defendants.

1. *Defendant Kurth.* Kurth who operated a store in Lawrence went to Godden, the vice-president of a bank in that city, about 2 p.m. on January 13, 1967, and told him that his wife had been missing for two hours, and that he had just received a telephone call demanding $10,000 or his wife would be killed. He asked Godden for a loan of $10,000 which was given to him. He said he was being watched, that if he did not go out with the money at once there would possibly be some harm done to his wife, and that he had been warned not to notify the police, or his wife would be killed. He gave Godden the registration number of his automobile, asked him to delay calling the police until he had "a good chance to get away" and left with the money. A few moments later Godden called the Kurth house and Mrs. Kurth answered the telephone. Godden then called the State and city police. About one-half hour later Kurth telephoned Godden and told him he had thrown the money over a snowbank and that he had been followed by a black car but did not get its number or see who was in it.

Later in the afternoon Kurth spoke to Leary at the district attorney's office and told him substantially the same story

he had told Godden, but with more detail about what he did after leaving the bank with the money. He said he went to a parking lot where he had left his car and drove from there "by named routes to Groveland" where he saw the black car following him and he threw the money over the snowbank. Leary told Kurth he did not believe his story and that the police would investigate and interview him later. On January 17, 1967, Kurth repeated the same story to Leary and other officers and was again told that they did not believe him.

On January 18, 1967, Kurth again went to the office of the district attorney where he was questioned by Leary, with Jowett and another officer present. Kurth said that his first story was a hoax, that he panicked when he received the call and needed $10,000 for a girl friend who was pressing him for money, and that he went to the bank with the kidnap story but gave the money to the girl friend.

After discussing the second story for a while Kurth said that it was not true, that he had been having trouble with his sister over his father's estate and needed $10,000 to have her drop the contest. Kurth telephoned his sister and permitted Leary to listen but could not verify this third story and admitted it was a "lie."

Kurth then gave the police a fourth story to the following effect. On January 10, 1967, while in New York on a business trip, he went to a bar where he drank, watched "Go-Go" girls who were entertaining, and spoke to a man who was a stranger to him about his interest in one of the girls. The man said, "we can take care of that." Kurth had about $1,500 or $1,600 in his wallet at that time, told the man he owned a "T-bird" car and a yacht, described his home, and gave him his business card. After a half dozen drinks, some of them doubles, his memory was less sharp until he awoke in his hotel room the next morning with about $950 missing from his wallet. He decided it was best not to report the matter to the police and returned to Lawrence. About 1 P.M. on January 13, 1967, he received a telephone call at his office from a man who identified

himself as "Mr. Green." The man said he was the person Kurth had met in New York, that he was in Lawrence, and continued: "We have a contract and you are going to keep it. I am here to do the job and I want the balance of the money." He said he wanted the money by two thirty or he would take care of Kurth. Kurth arranged to meet the man at Samson's parking lot, and then went to the bank where he borrowed $10,000 after his talk with Godden which has been described above. Kurth went to the parking lot and gave the money to "the big fellow he had met at the bar in New York." From there he drove over the route to Groveland which he had described to the police in his first story, called Godden, went home, found the police waiting, and went over the route with the police.

On January 18, 1967, Kurth also told Leary that on January 16 he had received a telephone call from "Mr. Green" and arranged to meet him in a nearby restaurant. With "Green" at the restaurant was a second man later identified as Gugliucci. "Green" told him to be in New York at a designated place the following week and to stick with his first story about the incident of the thirteenth "or I will blast you through the wall."

About 4 P.M. on January 20, 1967, while Kurth was at the police station with Leary and Jowett, he received a telephone call from his store manager to the effect that "Mr. Green" had been in the store twice and was going to call.[2] Kurth and the officers went to the store, Kurth going to his office and the officers stationing themselves outside the office. Gugliucci entered the store, went to Kurth's office and came out after a few minutes. He left the store, went down a street where he spoke to Kaplan, and then returned to the store. Leary went up to Kaplan, showed him his badge and questioned him. Gugliucci then came along. Leary again identified himself and at his request the two men went with him to the police station for ques-

---

[2] It is not clear from the bills of exceptions whether the evidence described in the rest of this paragraph was limited to Kurth or whether it was admitted without limitation and therefore applies to the three defendants.

tioning. Kurth also went to the station and while there he looked at Kaplan and Gugliucci separately through a one way mirror. He identified Kaplan as the "big fellow" he had met in New York, the man to whom he had given the money in the parking lot on the thirteenth and the man he had seen in the restaurant on the sixteenth. He identified Gugliucci as the man he had first seen in the restaurant on the sixteenth and the man who had walked into his office twice earlier on the day of the identification, who while there the first time had told him to be in New York the following Tuesday with another $10,000 "or the big fellow would get him," and who while there the second time wanted to make sure Kurth got the message about bringing the money the next week. Kurth identified his business card found on Gugliucci as one he had given Kaplan in New York and on which, at Kaplan's request, he had written his own telephone numbers.

2. *Defendant Kaplan.* At the police station on January 20, Leary told Kaplan he was under arrest for extortion. He accused him of threatening Kurth, through Gugliucci, with physical harm if he did not bring the money to New York, of pressing their luck too far, and of having obtained $10,000 a week before on the thirteenth and now being back for more. Kaplan denied any threat was made and said that Kurth was a good friend of theirs, that his buddy had met Kurth in a bar in New York and Kurth had then given them $1,500, that Kurth was throwing his money around and he, Kaplan, thought he would get a piece of it because he was a gambler, owed money to bookies and sharks and needed plenty of money, that Kurth had a problem and they were going to take care of it for him, and that Kurth had not given them $10,000 the previous week but only $8,000. Kurth was brought into the room and he identified Kaplan as the man he had met in the bar in New York, and he repeated what had taken place in his office that afternoon when Gugliucci came into his office and demanded more money.

Later on the twentieth Kaplan asked Jowett at the police

station whether Kurth had told him about the "part on the bridge," and Jowett replied that he had not. Kaplan then told him: " 'The day on the bridge Mr. Kurth pulled up on the bridge,' . . . 'he was very excited,' and he said, . . . 'you have got to do it today,' . . . 'her car is in the garage.' . . . 'You're to put the body in the car, take the car and burn the car.' "

3. *Defendant Gugliucci.* At the police station on January 20, Leary told Gugliucci he was in serious trouble and that he was under arrest for extortion. Kurth was brought into the room and he identified Gugliucci as the man he met for the first time in the restaurant on the sixteenth. He also related what had taken place in his office that afternoon (the twentieth). Gugliucci asked Kurth: "Billy, do you know what you are saying? Aren't you going to tell him about riding my cab in New York?" Kurth replied that he was never in his cab in New York and then left the room. The officers asked Gugliucci for some identification and he produced a New York driver's license from his wallet. He was asked what else was in the wallet and he spread the contents on the desk. Included was one of Kurth's business cards with some numbers written on it. Gugliucci said that Kurth gave it to him, but refused to discuss a number written on it. Kurth's home address and his office and home telephone numbers were written on the back of the card, and some dollar amounts in figures were written on the front of the card. The card was introduced in evidence against all three defendants.

We have frequently noted that "the manner in which conspiracy cases are customarily tried [is] by allowing in the first instance as against each defendant separately evidence of such acts, knowledge and admissions as appear to affect the particular defendant and then, when sufficient evidence has accumulated to support a fair inference of the existence of a conspiracy, by removing the limitation, so that evidence of the acts, knowledge and admissions of all who are found to have joined in the conspiracy, during the course of and in pursuance of the conspiracy, becomes ap-

plicable against all the conspirators." *Commonwealth* v. *Benesch,* 290 Mass. 125, 132–133. *Commonwealth* v. *Riches,* 219 Mass. 433, 438. *Commonwealth* v. *Dyer,* 243 Mass. 472, 507. *Commonwealth* v. *Kelley, ante,* 77, 85. For a modification of this customary practice for the trial of conspiracy cases, see *Commonwealth* v. *Kiernan,* 348 Mass. 29, 56–58.

This case was tried in "the manner in which conspiracy cases are customarily tried" to the extent that most of the evidence, when introduced, was limited to a particular defendant, and those limitations were still in effect when the defendants' motions for directed verdicts were argued and decided. The record does not show, as it did in *Commonwealth* v. *Dougherty,* 343 Mass. 299, 302–303, that the motions "were argued in contemplation of such ruling as the judge might thereafter make in respect of removing the limitations on evidence." We know from the record before us that after denying the motions for directed verdicts the judge gave the jury instructions which permitted them, in some circumstances depending on facts to be found by them, to disregard the limits which had been placed on the evidence when it was admitted and to consider it against additional defendants. Such instructions or rulings given at that point in the trial cannot be considered in our determination of the sufficiency of the evidence against each defendant at the earlier point when his motion was denied.

We have also frequently noted that "the principles by which to determine the elements essential to conspiracy as a common law crime are settled in this Commonwealth" and therefore we shall not repeat them. *Commonwealth* v. *Dyer,* 243 Mass. 472, 483. *Attorney Gen.* v. *Tufts,* 239 Mass. 458, 493–494. *Commonwealth* v. *Beal,* 314 Mass. 210, 221. *Commonwealth* v. *Kiernan,* 348 Mass. 29, 55–56. *Commonwealth* v. *Monahan,* 349 Mass. 139, 153–154. Applying those settled principles to the evidence summarized above we hold that the evidence which had been admitted as to each of the three defendants was insufficient to warrant submission of the case to the jury. The evidence falls far short of what would be necessary to permit a finding that

any of the defendants entered into an agreement to murder Mrs. Kurth. The only reference to the subject of killing anyone is in the statement of the defendant Kaplan, admitted against him only, that Kurth asked him to put someone's body in a car and burn the car. There is no evidence to permit a finding that Kaplan or anyone else agreed to do what Kurth asked him to do. The evidence about the payment of $10,000 by Kurth to Kaplan and the request by Gugliucci that Kurth bring $10,000 more to New York, if believed, would permit a strong inference that something other than an ordinary lawful business transaction was involved; but it would not permit an inference that the parties had entered into an agreement to murder Mrs. Kurth. It was therefore error to deny the defendants' motions for directed verdicts of not guilty.

In view of our holding above, we do not reach or decide the question of the correctness of instructions given by the judge to the jury, after denying the motions for directed verdicts, on the circumstances under which they might consider the statements of one defendant to the police as evidence against the other defendants. Involved is the question whether the statements were made during the existence of and in furtherance of the common design or purpose of the conspiracy (*Commonwealth* v. *Rogers*, 181 Mass. 184, 193–194), or whether they were made after the conspiracy, if any, had terminated by reason of police action and were therefore at most admissions which could be considered only against the particular defendant making them. *Commonwealth* v. *McDermott*, 255 Mass. 575, 581. *Commonwealth* v. *Snyder*, 282 Mass. 401, 416. *Commonwealth* v. *Beaulieu.* 333 Mass. 640, 656. *Commonwealth* v. *Dahlstrom*, 345 Mass. 130, 134. *Krulewitch* v. *United States*, 336 U. S. 440, 443–444.

*Exceptions sustained.*